928 F.Supp. 1239 (1996)
In re JWP INC. SECURITIES LITIGATION.
AUSA LIFE INSURANCE COMPANY, et al., Plaintiffs,
v.
Andrew T. DWYER, et al., Defendants.
Melvin S. ARONOFF, et al., Plaintiffs,
v.
Andrew T. DWYER, et al., Defendants.
AUSA LIFE INSURANCE COMPANY, et al., Plaintiffs,
v.
ERNST & YOUNG, Defendant.
Nos. 92 Civ. 5815 (WCC), 93 Civ. 6830 (WCC), 94 Civ. 2201 (WCC) and 94 Civ. 3116 (WCC).
United States District Court, S.D. New York.
May 22, 1996.
Supplemental Clarifying Opinion June 12, 1996.
*1240 *1241 *1242 *1243 *1244 *1245 Wechsler, Harwood, Halebian & Feffer L.L.P., New York City (Robert I. Harwood, Daniella Quitt, of counsel), Member of Class Plaintiffs' Executive Committee and Class Plaintiffs' Liaison Counsel, Wolf, Popper, Ross, Wolf & Jones, L.L.P., New York City (Robert M. Kornreich, Chet B. Waldman, of counsel), Schoengold & Sporn, P.C., New York City (Samuel P. Sporn, of counsel), Rabin & Garland, New York City (Allan K. Peckel, of counsel), Members of Class Plaintiffs' Executive Committee, Cadwalader, Wickersham & Taft, New York City (Debra Brown Steinberg, Edwin David Robertson, Haven C. Roosevelt, of counsel), for Plaintiffs AUSA Life Insurance Company, Bankers United Life Assurance Co., Crown Life Insurance Co., General Services Life Insurance Co., Life Investors Insurance Co. of America, Modern Woodmen of America, Monumental Life Insurance Co., The Mutual Life Insurance Co. of New York and The Prudential Insurance Co. of America.
Zwerling, Schachter, Zwerling & Koppell, L.L.P., New York City (Robin F. Zwerling, Joseph Lipofsky, of counsel), for Plaintiffs Melvin S. Aronoff and Rina Patricia Zilbermann.
Coblence & Warner, New York City (Howard S. Schrader, of counsel), for Defendant Andrew T. Dwyer.
Solomon Zauderer, Ellenhorn, Frischer & Sharp, New York City (Harry Frischer, David A. Proshan, of counsel), for Defendant Ernest W. Grendi.
Kramer, Levin, Naftalis & Frankel, New York City (Charlotte M. Fischman, Jeffrey W. Davis, Jonathan H. Canter, of counsel), for Defendant Joseph E. Grendi.
Shereff, Friedman, Hoffman & Goodman, L.L.P., New York City (Andrew J. Levander, Shari L. Steinberg, David S. Hoffner, Joseph I. Fontak, of counsel), for Defendant Joseph A. Gallo.
Kaye, Scholer, Fierman, Hays & Handler, New York City (Jay G. Strum, Jonathan L. Hochman, David B. Soskin, of counsel), for Defendants Innis O'Rourke, Jr., Craig C. Perry, Edmund S. Twining, Jr. and George M. Duff, Jr.
Schulte Roth & Zabel, New York City (Martin L. Perschetz, Howard O. Godnick, Hollis A. Bart, Lisa K. Buckser, Christopher P. Ronan, of counsel) and General Counsel's Office Ernst & Young, New York City (Patricia A. Connell, Michael J. Crane, of counsel), for Defendant Ernst & Young.

OPINION AND ORDER
WILLIAM C. CONNER, Senior District Judge:
The four above-captioned actions, which have been consolidated for all pre-trial purposes and which have been scheduled for a joint trial before this court, arise out of the collapse of JWP, Inc. ("JWP"). In 1980, JWP was a relatively small company whose business consisted primarily of owning a regulated water utility in the New York metropolitan area. Between 1984 and 1992, JWP expanded rapidly by acquiring more than sixty companies, usually in the fields of mechanical and electrical engineering, construction, and information products, services and technology. By 1992, JWP was an international conglomerate with projected revenues for that year of $4.3 billion and a reported net worth, as of December 31, 1991, of over $500 million.
On January 27, 1992, David Sokol became JWP's President and Chief Operating Officer. He subsequently uncovered numerous alleged accounting irregularities at JWP and its subsidiaries. In August 1992, at Sokol's request, JWP retained Deloitte & Touche ("D & T") to investigate. By the time Sokol's *1246 and D & T's investigations were complete, JWP had restated its audited consolidated financial statements for 1990 and 1991 and had twice restated its unaudited consolidated financial statements for the first two quarters of 1992.[1] The writeoffs wiped out JWP's entire net worth, and the company was placed in involuntary bankruptcy in December 1993.[2]
JWP's troubles did not go unnoticed. Between August 6, 1992, and August 14, 1992, thirteen shareholder class action complaints were filed, followed by several more in the subsequent months. On November 2, 1992, this court issued an order consolidating the nineteen shareholder actions then pending into an action captioned In Re JWP, Inc. Securities Litigation ("In Re JWP"), Lead Case No. 92 Civ. 5815. On January 15, 1993, the shareholder plaintiffs filed a consolidated class action complaint, and on September 24, 1993, the court certified a class consisting of all persons who purchased JWP common stock in the open market between May 1, 1991, and October 2, 1992. The class plaintiffs assert claims against the following defendants: Andrew Dwyer, JWP's Chief Executive Officer, Chairman of its Board of Directors and, until David Sokol was appointed, its President; Ernest Grendi, JWP's Executive Vice-President and Chief Financial Officer; Joseph Grendi, the Chief Financial Officer and Executive Vice President of various JWP subsidiaries (collectively, "management defendants"); Innis C. O'Rourke, Jr.; Edmund S. Twining, Jr.; Craig C. Perry; and George M. Duff, Jr. (collectively, "audit committee defendants"). The class plaintiffs have brought claims against these defendants for violations of §§ 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t, and for common law fraud.
On September 30, 1993, a number of institutional investors ("AUSA plaintiffs"),[3] who had purchased long-term debt securities from JWP between November 1988 and March 1992, filed an action captioned AUSA Life Insur. Co. v. Dwyer ("AUSA v. Dwyer"), No. 93 Civ. 6830, against the management defendants, the audit committee defendants and Joseph Gallo, JWP's Treasurer. The AUSA plaintiffs assert claims against each of the defendants under §§ 10(b) and 20 and under §§ 12(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77l(2), 77o. They also assert common law claims against each of the defendants for fraud, negligent misrepresentation and tortious interference with contract.
Subsequently, on April 28, 1994, the AUSA plaintiffs filed an action captioned AUSA Life Insur. Co. v. Ernst & Young ("AUSA v. E & Y"), No. 94 Civ. 3116, against Ernst & Young ("E & Y"), JWP's independent auditor. In that case, the AUSA plaintiffs assert claims under § 10(b) and for common law fraud and negligent misrepresentation.
In addition, plaintiffs Melvin S. Aronoff and Rina Patricia Zilberman, as executrix of the estate of Andre H. Zilberman, (collectively, "Aronoff plaintiffs") assert claims against the management defendants and the audit committee defendants. This action, filed on March 29, 1994, and captioned Aronoff v. Dwyer, No. 94 Civ. 2201, arose out of the August 1991 sale of a company owned by Aronoff and Andre Zilberman to JWP in exchange for a mixture of cash and JWP *1247 common stock. The Aronoff plaintiffs have brought claims against each of the defendants under §§ 10(b) and 20 and for common law fraud and negligent misrepresentation.
Each of the defendants has filed a motion for summary judgment. In addition, the class plaintiffs and defendants E & Y and Gallo have made motions requesting that we hold two trials rather than a single joint trial of all four of these actions. In the interests of clarity, we address each defendant's motion in turn, indicating where necessary to which action that motion applies. The section addressing each defendant's motion contains a statement of the facts relevant to that motion.

DISCUSSION

I. Motions for Summary Judgment
Summary judgment should be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has held that the entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those [materials] which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323, 106 S.Ct. at 2553. It may discharge that burden merely by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case." Id. at 325, 106 S.Ct. at 2554; Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223-24 (2d Cir.1994).
In order to defeat summary judgment, the nonmoving party must "go beyond the pleadings and ... designate `specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324, 106 S.Ct. at 2553. No genuine issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986). The burden on the nonmoving party is tempered, however, by the rule that "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255, 106 S.Ct. at 2513.

A. E & Y's Motion
E & Y served as JWP's independent auditor from 1985 through the completion of its audit of JWP's 1992 consolidated financial statement. Beginning in August 1992, E & Y was also involved in reviewing JWP's consolidated financial statements for previously audited years in order to determine whether any of those consolidated financial statements should be restated. This review, instigated by Sokol and conducted by management and D & T in conjunction with E & Y, resulted in management's decision to restate JWP's 1990 and 1991 audited consolidated financial statements. On February 9, 1994, JWP engaged D & T, rather than E & Y, to audit its 1993 consolidated financial statement.
The AUSA plaintiffs invested a total of $149 million in JWP debt securities, which they purchased through private placements between November 1988 and March 1992. The AUSA plaintiffs allege that in making those purchases, they relied directly on materially false and misleading statements that E & Y made in the unqualified audit reports that it issued on JWP's 1987-1991 consolidated financial statements. The AUSA plaintiffs also allege that they relied directly on materially false and misleading representations that E & Y made in no-default certificates[4] dated February 22, 1989, February *1248 14, 1990, February 14, 1991, and February 13, 1992. They have asserted claims against E & Y under § 10(b) and for common law fraud and negligent misrepresentation. E & Y seeks summary judgment dismissing each of these claims.

a. Section 10(b)
In order to recover on a claim under § 10(b), the AUSA plaintiffs must prove that "in connection with the purchase or sale of securities, [E & Y], acting with scienter, made a false material representation or omitted to disclose material information and that [the AUSA plaintiffs'] reliance on [E & Y's] actions caused [them] injury." Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 61 (2d Cir.1985). E & Y contends that the AUSA plaintiffs' § 10(b) claim must be dismissed for two reasons: 1) it is barred by the applicable statute of limitations, and 2) the AUSA plaintiffs cannot demonstrate that the alleged misrepresentations were made in connection with the purchase or sale of JWP's notes. We reject both arguments.

i. Statute of Limitations
In Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 & n. 9, 111 S.Ct. 2773, 2782 & n. 9, 115 L.Ed.2d 321 (1991), the Supreme Court held that private actions under § 10(b) must be commenced within one year after the discovery of the facts constituting the violation and within three years after the violation occurred.[5] The Second Circuit has held that "`discovery' ... includes constructive or inquiry notice, as well as actual notice." Menowitz v. Brown, 991 F.2d 36, 41 (2d Cir. 1993). The test is an objective one:
A plaintiff in a federal securities case will be deemed to have discovered fraud ... when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud.... Moreover, when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry. Such circumstances are often analogized to "storm warnings."
Dodds v. Cigna Securities, Inc., 12 F.3d 346, 350 (2d Cir.1993) (internal citations omitted), cert. denied, ___ U.S. ___, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). If the plaintiff makes reasonably diligent inquiries but fails to discover the fraud, the running of the limitations period is tolled. See Westinghouse Elec. Corp. v. 21 Int'l Holdings, Inc., 821 F.Supp. 212, 222 (S.D.N.Y.1993). Issues of constructive knowledge and reasonable diligence are usually questions of fact for the jury to decide. See In re Integrated Resources Real Estate Ltd. Partnerships Securities Litigation, 815 F.Supp. 620, 638 (S.D.N.Y.1993). Summary judgment is appropriate, however, "when a court can readily impute knowledge of a probable fraud to the plaintiff from the face of the documents and facts in evidence supporting the motion for summary judgment ...," id., and when no question of fact exists concerning the reasonable diligence of the plaintiff's inquiry. The plaintiff may not avoid her duty to inquire merely by relying on reassuring statements that management made in conjunction with the information that placed plaintiff on notice or on management's continued failure to disclose the truth behind the allegedly misrepresented facts. See id., at 640.
In September 1993, the AUSA plaintiffs and E & Y entered into a tolling agreement under which AUSA v. E & Y is deemed to have been filed on September 23, 1993. See Ex. 14, attached to Affidavit of Debra Brown Steinberg, dated Feb. 16, 1996. Therefore, the earliest date on which the AUSA plaintiffs could have been on inquiry notice and *1249 still have filed suit within the limitations period is September 23, 1992.
We find that sufficient storm warnings were present by August 14, 1992, to place the AUSA plaintiffs on inquiry notice of their claims. We are aware, of course, of the Second Circuit's decision in In re Ames Dep't Stores, Inc. Note Litigation, 991 F.2d 968 (2d Cir.1993). In that case, the Second Circuit observed that:
holders of equity securities often, perhaps usually, have different concerns from those of holders of debt securities. What primarily matters to the latter is that the company meet its obligations on the debt instrument when due. In contrast, investors in equity securities generally are concerned with a company's earning prospects since equity securities usually trade, to a greater extent, on a company's earnings outlook.
Ames, 991 F.2d at 980. Hence, the court held that the issuance of press releases and financial statements that revealed that the company was suffering losses and inventory control problems and had been hurt by a slow economy, but that did not significantly question its long-term financial viability, did not place its noteholders on inquiry notice. Moreover, the filing of one shareholder securities fraud suit did not place the noteholders on inquiry notice because the complaint was brief and did not mention allegations that were central to the noteholders' case. We believe that this case may be distinguished from Ames because the storm warnings present in this case were much more extensive and because the information available to the public included allegations of precisely the type of accounting fraud that forms the heart of the AUSA plaintiffs' case.
Throughout the first half of 1992, JWP issued a series of statements in which it described 1992 as a rebuilding year for the company: it was getting its house in order following Sokol's appointment and its earnings were suffering from the general economic downturn, but the future looked promising. See, e.g., Ex. 17, attached to Perschetz Aff. Then, on August 4, 1992, and August 6, 1992, JWP issued press releases that revealed the resignation of an outside director, the possibility that an accounting review would require the company to take as much as $60,000,000 in after-tax writeoffs and the filing of two shareholder suits against JWP and its officers and directors. See Ex. 18, attached to Perschetz Aff.; Ex. 241, attached to Brown Steinberg Aff. In light of the Ames court's comments about the distinction between noteholders' and shareholders' interests, these press releases alone did not contain sufficient information to place the AUSA plaintiffs on inquiry notice.
The information that became available on August 14, 1992, compels a different conclusion, however. On that day, JWP issued a press release announcing that as a result of its outside auditors' review, it was restating its consolidated financial statement for the first quarter of 1992 and revising its earning results from the second quarter to reflect net after-tax charges totalling $64,500,000. The August 14 press release also revealed that a total of thirteen shareholder class action suits had been filed against the company and that Ernest Grendi, JWP's longtime Chief Financial Officer, had been replaced, although he retained his position as Executive Vice President and his seat on the Board of Directors. See Ex. 4, attached to Perschetz Aff. Furthermore, JWP's Form 10-Q for the second quarter of 1992 was filed the same day. That document contained financial statements reflecting the writeoffs and provided more details about the lawsuits. It stated that each of the suits alleged, inter alia, that JWP, its management and its directors had violated § 10(b) by materially overstating JWP's inventory, assets and earnings and by making false and misleading statements in various public documents, including JWP's annual reports. It also disclosed that one of the shareholders' complaints, DiChiara v. JWP, Inc., No. 92 Civ. 5891, named E & Y as a defendant. See Ex. 5, at 14, attached to Perschetz Aff.
It is beyond dispute that the AUSA plaintiffs were very concerned with having access to accurate and up-to-date financial information on JWP in order to assess the health of their quite substantial investments. The note agreements themselves bear witness to this concern by obligating JWP promptly to *1250 transmit to the AUSA plaintiffs copies of JWP's unaudited quarterly and audited annual financial statements, its SEC filings, all audit reports submitted to JWP by its independent accountant and, on an annual basis, no-default certificates from its independent accountant. See, e.g., Ex. 9, at ¶ 5A, attached to Perschetz Aff. Thus, allegations of accounting fraud like those contained in the class action complaints disclosed in JWP's Form 10-Q, coupled with the announcement that JWP's CFO had been relieved of his duties, should have greatly concerned the AUSA plaintiffs, who are extremely sophisticated investors. See Lenz v. Associated Inns & Restaurants Co. of America, 833 F.Supp. 362, 375-76 (S.D.N.Y.1993) (holding that sophistication of investor is relevant factor in determining when plaintiff placed on inquiry notice). We therefore hold that the information available as of August 14, 1992, was sufficient to place the AUSA plaintiffs on inquiry notice of the probability of widespread accounting fraud, which could call into question the long-term financial health of JWP.[6]
We are not dissuaded from our conclusion by that portion of the August 14, 1992, press release that stressed that JWP's management believed that the company had a "solid foundation to rebuild earnings," that it was "well positioned for earnings growth as the economy recovers" and that its "financial position [was] strong." Ex. 4, attached to Perschetz Aff. When an investor has received information that places her on inquiry notice, she is not relieved of her duty of inquiry because management contemporaneously makes reassuring statements. See Integrated Resources, 815 F.Supp. at 640.
Our conclusion that the AUSA plaintiffs were on inquiry notice as of August 14, 1992, does not end our discussion of this issue, however. We must now consider whether the AUSA plaintiffs made a reasonably diligent attempt to uncover the alleged fraud. The evidence presented by the AUSA plaintiffs indicates that they took some steps to investigate the situation at JWP. Their representatives attended a meeting held by Dwyer, Sokol and Gallo at the offices of JWP's investment banker on August 21, 1992. See Ex. 28, attached to Perschetz Aff. At that meeting, Sokol and Dwyer attempted to allay the concerns of JWP's bank lenders and the AUSA plaintiffs about JWP's continued financial viability. Sokol and Dwyer acknowledged that JWP was facing difficulties and informed the AUSA plaintiffs that as of September 30, 1992, JWP might be in default of covenants in the note agreements that limited asset sales by JWP because it was attempting to sell off non-core businesses and pay down its debt. Sokol and Dwyer did not indicate, however, that JWP would fail to make payments to the AUSA plaintiffs as they came due. See Ex. 264, attached to Brown Steinberg Aff.; Ex. 265, attached to Brown Steinberg Aff.
Furthermore, as required by the note agreements, JWP issued no-default certificates to the AUSA plaintiffs on August 26, 1992. Those certificates represented that as of June 30, 1992, Gallo, JWP's Treasurer, was not aware of any defaults under its note agreements. See, e.g., Ex. 45, attached to Affidavit of Shari L. Steinberg, dated Jan. 5, 1996. The note agreements require, inter alia, that JWP keep proper books and records. See Ex. 9, at ¶ 5F, attached to Perschetz Aff. Therefore, a reasonable jury could consider these no-default certificates to be an affirmative representation by JWP's management that the allegations of accounting fraud were not true. While we recognize that an investor may not satisfy his duty of inquiry by simply sitting back and accepting the reassurances of management, see Westinghouse, 821 F.Supp. at 223, we believe that signed no-default certificates differ qualitatively from a general verbal statement by management or a press release asserting that "everything's OK."
We acknowledge that the evidence is far from overwhelming that the AUSA plaintiffs *1251 were reasonably diligent prior to September 23, 1992, in investigating whether they could assert the claims that they have since brought against E & Y. We are mindful, however, of the distinction that the Second Circuit drew in Ames between the interests of shareholders and those of noteholders. If the amount and type of information sufficient to put noteholders and shareholders on inquiry notice differs, it follows that what constitutes reasonable diligence may differ as well. The noteholders did make some efforts to investigate the long-term financial viability of JWP. Furthermore, a reasonable jury could find it significant that the AUSA plaintiffs received no-default certificates during the crucial time period. Therefore, we decline to hold, as a matter of law, that the AUSA plaintiffs were not reasonably diligent under the circumstances. We believe that this issue presents a question of fact for the jury to decide.

ii. In Connection With
Next, E & Y argues that it is entitled to summary judgment on the AUSA plaintiffs' § 10(b) claim because none of the alleged misrepresentations that it made were in connection with the purchase or sale of JWP's notes. In this circuit, in order to satisfy the "in connection with" requirement, the alleged misrepresentation must have "direct pertinence" to the purchase or sale of securities at issue in the case. See Rand v. Anaconda-Ericsson, Inc., 794 F.2d 843, 847 (2d Cir.), cert. denied, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986) (citing Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 942 (2d Cir.), cert. denied, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984)); In re Leslie Fay Cos., Inc. Securities Litigation, 871 F.Supp. 686, 697 n. 10 (S.D.N.Y.1995) (Conner, J.). A more exact formulation of this standard has proven elusive. The Second Circuit has, however, taken a broad view of the "in connection with" requirement. At least in fraud-on-the-market cases, the Second Circuit has held that misrepresentations that affect the integrity of the securities market or that constitute the sort of information that a reasonable investor would consider in evaluating a company's prospects satisfy the "in connection with" requirement. See In re Ames Dep't Stores, Inc. Stock Litigation, 991 F.2d 953, 965-66 (2d Cir.1993); see also Leslie Fay, 871 F.Supp. at 694-97 (examining relevant precedents at length and concluding that Ames court's formulation of "in connection with" requirement was not affected by Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994)). The Second Circuit has also stated that:
when the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value, made by a defendant whose position made it reasonable for the plaintiff to rely on the representation and imposed some duty on the defendant to be honest ..., then whatever problems there may be with the case, a connection between the fraud and the transaction should not be one of them.
Ames, 991 F.2d at 967.
We consider first whether E & Y's audit reports were issued in connection with the AUSA plaintiffs' purchases of JWP's notes. Clearly, if the AUSA plaintiffs were shareholders bringing this action under a fraud-on-the-market theory, the holding in Ames would be directly controlling and E & Y's audit reports would clearly satisfy the "in connection with" requirement. Those audit reports are precisely the sort of information that a reasonable investor would consider in evaluating JWP's prospects. Of course, this case differs somewhat from Ames because the AUSA plaintiffs purchased JWP's notes in private placements, rather than in the open market, and assert that they relied directly on E & Y's audit reports in making the decision to invest. This distinction does not further E & Y's argument, however. Indeed, the circumstances of this case present a more, rather than less, compelling scenario for finding that the "in connection with" requirement is satisfied. In this case, not only would it have been reasonable for the AUSA plaintiffs to consider E & Y's audit reports in forming their opinion of JWP's notes, there is some indication that they actually did so. The note agreements specifically state that JWP provided the AUSA plaintiffs with financial information from prior years, including audited year-end *1252 consolidated financial statements certified by E & Y. See, e.g., Ex. 9, at ¶ 8B, attached to Perschetz Aff. The audit reports are therefore directly related to the note purchases.
E & Y contends that any alleged misrepresentations that it made in the audit reports for the years preceding each AUSA plaintiff's note purchase were not made in connection with that purchase because E & Y had no reason to know, when it issued those audit reports, that JWP would subsequently issue those notes. E & Y cites Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183 (7th Cir.1993), and our discussion of that decision in Leslie Fay, 871 F.Supp. at 697-98, in support of its argument. In Frymire-Brinati, the Seventh Circuit held that a misrepresentation contained in an audit report satisfies the "in connection with" requirement if the accountant that issued the report knew or should have appreciated that the report would be used to purchase or sell securities. See Frymire-Brinati, 2 F.3d at 189.
We have stated previously that we consider the Seventh Circuit's "reason to know" formulation to be merely another way of stating "the principle articulated by Judge Friendly in Chemical Bank that `in connection with' means that the fraud must have some direct pertinence to a securities transaction." Leslie Fay, 871 F.Supp. at 697. This case provides us with no reason to depart from that conclusion, as we would reach the same result under the Seventh Circuit's version of the standard. JWP financed its aggressive acquisition program through numerous private placements of debt securities between 1988 and 1992. E & Y was JWP's independent auditor throughout that period and was indisputably aware of these activities. E & Y clearly had reason to know that JWP would disseminate its audit reports to prospective investors.[7]
Furthermore, we note that Frymire-Brinati concerned a rather atypical fraud in which a corporation sold preferred stock in a one-time private placement to corporate insiders that was specifically designed to sweeten the company's balance sheet in order to facilitate a merger. The Second Circuit has cautioned district courts dealing with garden-variety securities fraud cases against taking too narrow a view of the "in connection with" requirement based on the reasoning of cases that dealt with atypical frauds. See Ames, 991 F.2d at 966-67. There is certainly nothing atypical about the AUSA plaintiffs' allegations against E & Y, which concern its knowledge of, or reckless failure to detect, accounting fraud in the form of overvalued assets, overstated earnings, understated liabilities and inadequate reserves. The only thing unusual about the allegations in this case is the sheer scale of the alleged fraud.
We need not address in detail the issue of whether the no-default certificates satisfy the "in connection with" requirement. Prior to making their 1990 and 1992 note purchases, those AUSA plaintiffs who had previously purchased JWP's notes received no-default certificates from E & Y pursuant to those earlier note agreements. Suffice it to say that those no-default certificates are clearly the sort of representations that are directly pertinent to subsequent note purchases, since the no-default certificates indicate that JWP's financial situation, as it was evaluated by E & Y in the course of its annual audit, was sufficiently robust that JWP was not in default of its obligations under any of its loan or note agreements. Therefore, with respect to the § 10(b) claim of any AUSA plaintiff who received one or more no-default certificates under other note agreements with JWP prior to purchasing JWP's notes in 1990 or 1992, the alleged misrepresentations in those documents satisfy the "in connection with" requirement.
Finally, E & Y argues that the alleged misrepresentations contained in E & Y's 1991 audit report cannot satisfy the "in connection with" requirement because the 1991 audit report was not publicly available until after the AUSA plaintiffs' 1990 and 1992 note purchases were completed. E & Y *1253 is on more stable ground with this argument. Misrepresentations made after the purchase or sale in question cannot satisfy the "in connection with" requirement. See Goldman v. McMahan, Brafman, Morgan & Co., 1987 WL 12820, at *8 (S.D.N.Y. June 18, 1987). It is undisputed that the 1991 audit report first became publicly available on March 12, 1992, and that the AUSA plaintiffs completed their 1992 note purchases on March 6, 1992. Furthermore, the AUSA plaintiffs do not allege that they relied on the 1991 audit report in making their 1992 note purchases. See AUSA/E & Y Complaint, at ¶ 67. We therefore grant E & Y's motion for summary judgment dismissing that portion of the AUSA plaintiffs' § 10(b) claim that is based on allegations that the 1991 audit report was false and misleading.

b. Pendent State Claims
E & Y has moved, in the event that we dismiss the AUSA plaintiffs' § 10(b) claim in its entirety, for summary judgment dismissing their pendent common law claims. Because we have not done so, this portion of E & Y's motion is denied.

c. Negligent Misrepresentation
The AUSA plaintiffs have asserted a claim against E & Y for negligent misrepresentation based on E & Y's representations in the 1987-1991 unqualified audit reports and in the no-default certificates issued between 1988 and 1992. Under New York law, the elements of a claim for negligent misrepresentation are: (1) carelessness in imparting words (2) upon which others were expected to rely and (3) upon which they acted or failed to act (4) to their damage. Furthermore, (5) the author must express the words directly, with knowledge that they will be acted upon, to one to whom the author is bound by some relation of duty or care. See The Pits, Ltd. v. American Express Bank Int'l, 911 F.Supp. 710, 720 (S.D.N.Y.1996). The relationship between the parties need not rise to the level of actual privity, but it must be sufficiently close that it approaches privity. See Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 493 N.Y.S.2d 435, 439-40, 483 N.E.2d 110, 113-15 (1985). Whether this special relationship exists is generally a question of fact. See Cewnick Fund v. Castle Harlan, Inc., 1993 WL 88243, at *10 (S.D.N.Y. Mar. 24, 1993); Polycast Technology Corp. v. Uniroyal, Inc., 792 F.Supp. 244, 269 (S.D.N.Y. 1992). If the underlying facts are not in dispute, however, the court may decide this issue as a matter of law. In this case, there is no dispute that E & Y was not in actual privity with the AUSA plaintiffs. E & Y contends that the AUSA plaintiffs have also failed to present evidence from which a reasonable jury could conclude that their relationship approached privity.
The New York Court of Appeals has set forth a three-prong test for ascertaining when this "near privity" relationship is present: (1) the defendant must have been aware that its representation would be used for a particular purpose or purposes; (2) the defendant must have intended that a known party or parties would rely thereon in furtherance of that purpose; and (3) there must have been some conduct on the part of the defendant linking it to that party or parties, which evinces the defendant's understanding of that party or parties' reliance. Credit Alliance, 493 N.Y.S.2d at 443, 483 N.E.2d at 118. The AUSA plaintiffs' negligent misrepresentation claim survived E & Y's motion to dismiss because their complaint sets forth allegations that, taken as true, satisfy this standard. See AUSA/E & Y Complaint, at ¶ 144; Ex. 39, at 14-16 (opinion and order of Brieant, J.), attached to Perschetz Aff. Nevertheless, on a motion for summary judgment following the completion of discovery, we may consider the issue anew.
With respect to the no-default certificates, the AUSA plaintiffs have identified undisputed facts from which a reasonable jury could conclude that a relationship approaching privity existed between E & Y and the AUSA plaintiffs. The no-default certificates themselves state that they are for the use of the AUSA plaintiffs. See Ex. 303, attached to Brown Steinberg Aff. It is clear from the face of the certificates that their purpose is to aid the AUSA plaintiffs in determining whether JWP has complied with its obligations under the note agreements. See id. Furthermore, by naming the AUSA *1254 plaintiffs in the certificates, see id., E & Y engaged in conduct evincing its awareness that the AUSA plaintiffs would rely on the no-default certificates. The Credit Alliance standard is therefore satisfied.
E & Y argues that it is nevertheless entitled to summary judgment because there is no evidence that E & Y and the AUSA plaintiffs communicated directly with one another concerning the no-default certificates. Although a plaintiff must demonstrate that the defendant's misrepresentation was "expressed directly" to the plaintiff, the New York courts have stopped short of establishing a per se rule requiring direct contact between the parties. See, e.g., Huang v. Sentinel Gov't Securities, 709 F.Supp. 1290, 1298 (S.D.N.Y.1989) (denying motion to dismiss negligent misrepresentation claim despite absence of allegations of direct contact). Compare Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co., 79 N.Y.2d 695, 586 N.Y.S.2d 87, 92, 597 N.E.2d 1080, 1085 (1992) (granting summary judgment despite evidence of one phone call between parties). Therefore, we conclude that the absence of direct contact is not, as a matter of law, fatal.
By contrast, with respect to the portion of their negligent misrepresentation claim that is based on statements that E & Y made in its unqualified audit reports, the AUSA plaintiffs have not identified specific facts that support their allegations of near privity between themselves and E & Y. Unlike the no-default certificates, the unqualified audit reports were not issued primarily for the benefit of the AUSA plaintiffs. There is no evidence that E & Y was retained to conduct the audits for the particular purpose of inducing the AUSA plaintiffs to invest in JWP's notes or of assuring the AUSA plaintiffs that JWP was in compliance with its obligations under the note agreements.[8] In addition, there is no evidence that E & Y ever agreed with JWP to provide audit reports for the AUSA plaintiffs' use. Neither E & Y's unqualified audit reports nor the engagement letters under which it conducted its annual audits mentions the AUSA plaintiffs. See Ex. 302 (1987-91 unqualified audit reports), attached to Brown Steinberg Aff.; Ex. 49 (1988-90 engagement letters), attached to Perschetz Aff. E & Y clearly conducted its audits and provided JWP with its unqualified audit reports with the understanding that the audit reports could serve any number of JWP's business purposes, including satisfaction of the SEC's filing requirements and distribution to JWP's shareholders.
The New York Court of Appeals has held that in the absence of indications that an audit report was prepared for a particular purpose or for the benefit of a particular plaintiff, that plaintiff may not recover on a claim for negligent misrepresentation based on alleged misstatements contained in that audit report. See Security Pacific, 586 N.Y.S.2d at 93-94, 597 N.E.2d at 1086-88; Westpac Banking Corp. v. Deschamps, 66 N.Y.2d 16, 494 N.Y.S.2d 848, 850, 484 N.E.2d 1351, 1352-53 (1985); Credit Alliance, 493 N.Y.S.2d at 444-45, 483 N.E.2d at 118-20. Furthermore, the AUSA plaintiffs present no evidence of any direct communication between the parties that could supply the otherwise absent linking conduct. Therefore, we grant E & Y's motion for summary judgment dismissing the AUSA plaintiffs' negligent misrepresentation claim to the extent that this claim is based on statements that E & Y made in its unqualified audit reports.
Finally, E & Y moves for summary judgment dismissing the AUSA plaintiffs' negligent misrepresentation claim on the ground that it is barred by the statute of limitations. The applicable statute of limitations for a claim of negligent misrepresentation is six years if the claim sounds in fraud. See Toto v. McMahan, Brafman, Morgan & *1255 Co., 1995 WL 46691, at *11 (S.D.N.Y. Feb. 7, 1995); Lee v. Kim, 1994 WL 586436, at *7 (S.D.N.Y. Oct. 25, 1994); Schwartz v. Michaels, 1992 WL 184527, at *30 (S.D.N.Y. July 23, 1992); Milin Pharmacy, Inc. v. Cash Register Systems, Inc., 173 A.D.2d 686, 570 N.Y.S.2d 341, 341-42 (1991). The claim accrues when the misrepresentation is made. See Toto, 1995 WL 46691, at *11; Schwartz, 1992 WL 184527, at *30. The AUSA plaintiffs' remaining negligent misrepresentation claim against E & Y clearly sounds in fraud, as they contend that although E & Y knew of or recklessly disregarded widespread accounting fraud at JWP, E & Y's no-default certificates falsely stated that JWP was not in default of any covenants in the note agreements. The earliest no-default certificate at issue in this case was dated February 22, 1989. Under the tolling agreement signed by E & Y and the AUSA plaintiffs, this action is deemed to have been filed on September 23, 1993. Therefore, the AUSA plaintiffs' negligent misrepresentation claim is based on statements that were made within six years of the filing date of the claims, and the claim is timely.

B. Audit Committee Defendants' Motion
The audit committee defendants are Innis C. O'Rourke, Jr., a member of JWP's audit committee from 1988 through 1992; Edmund S. Twining, Jr., a member from 1988 through 1991; Craig C. Perry, a member from 1990 through 1992; and George M. Duff, Jr., a member from 1987 to 1988 and from 1991 to 1992. According to JWP's proxy statements, the audit committee defendants were responsible for recommending to JWP's Board of Directors the engagement and discharge of JWP's independent auditor, analyzing the auditor's reports and making appropriate reports and recommendations to the Board. See Ex. 84 (1987-91 proxy statements), attached to Brown Steinberg Aff. Beginning with the 1992 proxy statement, JWP also stated that the audit committee was responsible for meeting with JWP's internal auditor and consulting with the outside auditor concerning matters relating to internal financial controls. See id. (1992 proxy statement). The class plaintiffs, the Aronoff plaintiffs and the AUSA plaintiffs contend that the audit committee defendants failed to fulfill their duties, recklessly disregarded a number of red flags that should have alerted them to JWP's fraudulent accounting and consequently made materially false or misleading representations about JWP's financial situation.
The class plaintiffs, the Aronoff plaintiffs and the AUSA plaintiffs have asserted claims against the audit committee defendants under §§ 10(b) and 20 and for common law fraud. The Aronoff plaintiffs and the AUSA plaintiffs each add a claim for negligent misrepresentation, and the AUSA plaintiffs also assert claims under § 12(2) and § 15 and for tortious interference with contract. The audit committee defendants seek summary judgment dismissing each of the claims.

1. Section 10(b)
All three sets of plaintiffs have asserted claims against the audit committee defendants under § 10(b). The audit committee defendants advance three arguments in favor of their motion for summary judgment: 1) they did not make many of the alleged misrepresentations, 2) the plaintiffs have failed to demonstrate the existence of a question of fact regarding whether the audit committee defendants acted with scienter, and 3) the AUSA plaintiffs' claims are barred by the applicable statute of limitations.

i. Existence of Misrepresentations
The audit committee defendants contend that they cannot be held liable under § 10(b) because they did not make a number of the alleged misrepresentations. They argue that the plaintiffs have alleged, at most, that they aided and abetted violations of § 10(b). In Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court overruled several decades of case law in this and other circuits that recognized a cause of action for aiding and abetting liability under § 10(b). Central Bank has generated some confusion among the lower courts over where to draw the line separating claims for primary violations from aiding and abetting claims.
*1256 A number of courts have held that a defendant may not be held primarily liable unless it has actually made a misrepresentation. See Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1225-27 (10th Cir.1996); In re MTC Elec. Technologies Shareholders Litigation, 898 F.Supp. 974, 985-87 (E.D.N.Y. 1995); In re Kendall Square Research Corp. Securities Litigation, 868 F.Supp. 26, 28 (D.Mass.1994). These courts have focused on the Supreme Court's holding that § 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.... The proscription does not include giving aid to a person who commits a manipulative or deceptive act." Central Bank, 511 U.S. at ___, 114 S.Ct. at 1448. Certain courts in the Ninth Circuit, however, have held that a defendant's substantial participation or intricate involvement in the preparation of misrepresentations that are actually made by someone else are sufficient to ground primary liability under § 10(b). See In re Software Toolworks Inc. Securities Litigation, 50 F.3d 615, 628-29 & n. 3 (9th Cir.1994), cert. denied, ___ U.S. ___, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995); Adam v. Silicon Valley Bancshares, 884 F.Supp. 1398, 1401 (N.D.Cal.1995); In re ZZZZ Best Securities Litigation, 864 F.Supp. 960, 968-72 (C.D.Cal.1994).
We agree with the Tenth Circuit's recent determination that:
To the extent that these cases allow liability to attach without requiring a representation to be made by defendant, and reformulate the "substantial assistance" element of aiding and abetting liability into primary liability, they do not comport with Central Bank of Denver.

Anixter, 77 F.3d at 1226 n. 10; see also MTC, 898 F.Supp. at 987 ("I conclude that if Central Bank is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, ... no matter how substantial that aid may be....").
The alleged misrepresentations that the audit committee defendants actually made include statements made in JWP's annual Forms 10-K, which were signed by the audit committee defendants. See, e.g., Ex. 82 (1987 Form 10-K), attached to Brown Steinberg Aff.; Ex. 20-23 (1988-91 Forms 10-K), attached to Steinberg Aff. They also include statements that were directly authorized by the Board of Directors  for example, statements found in the note agreements and in JWP's proxy statements. See, e.g., Ex. 7-11 (note agreements), attached to Brown Steinberg Aff.; Ex. 87, 89, 91, 93 (Board of Directors' resolutions approving note issues), attached to Brown Steinberg Aff.; Ex. 84 (JWP's 1987-92 proxy statements), attached to Brown Steinberg Aff. They do not include press releases issued by JWP's management or other statements that were not expressly authorized by the Board of Directors. Therefore, the audit committee defendants are entitled to summary judgment dismissing the plaintiffs' § 10(b) claims to the extent that those claims are based on alleged misrepresentations that the audit committee defendants did not make.

ii. Scienter
The audit committee defendants contend that they are entitled to summary judgment dismissing the plaintiffs' § 10(b) claims because there is no evidence that they acted with scienter. As we have previously held, § 10(b) "proscribes only behavior which is either deliberate or so reckless that an inference of fraudulent intent might be drawn by a reasonable finder of fact." In re Leslie Fay Cos., Inc. Securities Litigation, 835 F.Supp. 167, 173 (S.D.N.Y.1993). Fraudulent intent may be inferred where there is evidence that the defendant remained willfully blind to the truth. See In re Fischbach Corp. Securities Litigation, 1992 WL 8715, at *5-*6 (S.D.N.Y. Jan. 15, 1992). It is typically inappropriate to decide issues of intent and motive on summary judgment, unless the nonmovant has failed to adduce any evidence from which a reasonable jury could infer that the defendants acted with scienter. See Wechsler v. Steinberg, 733 F.2d 1054, 1058-59 (2d Cir.1984); McMahan & Co. v. Wherehouse Entertainment, Inc., 859 F.Supp. 743, 753 (S.D.N.Y.1994), rev'd on other grounds, 65 F.3d 1044 (2d Cir.1995), *1257 cert. denied, ___ U.S. ___, 116 S.Ct. 1678, 134 L.Ed.2d 781 (1996).
We find that the plaintiffs have produced evidence from which a reasonable jury could conclude that the audit committee defendants acted with sufficient recklessness that the jury could infer fraudulent intent. In the interest of brevity, we do not attempt to set forth a comprehensive list of the items of evidence that could, taken together, support an inference of scienter. We simply note a few. As early as 1987, E & Y issued letters to JWP's audit committee that indicated that JWP's internal audit department was an area of concern. Each year's letter stated that some improvement had been made, but that E & Y recommended further strengthening of the internal audit function. Nevertheless, the audit committee did not become actively involved in improving JWP's internal audit process. Furthermore, JWP's internal auditor did not attend audit committee meetings before September 1992, and the audit committee defendants did not read a report from the internal auditor until June 1992. See Ex. 123 (1987-91 "management letters" from E & Y to audit committee), attached to Brown Steinberg Aff.; O'Rourke Dep., at 64-65, 78-79, 148-49, attached as Ex. 102 to Affidavit of Robert I. Harwood, dated Feb. 15, 1996; Perry Dep., at 23, 30, 78-82, attached as Ex. 108 to Harwood Aff.; Twining Dep., at 43-45, 77, 188-89, attached as Ex. 131 to Harwood Aff. Through June 1992, Ernest Grendi attended every audit committee meeting. Furthermore, until that time, Ernest Grendi apparently drafted the minutes of those meetings. See Perry Dep., at 35, attached as Ex. 108 to Harwood Aff.; Ex. 104 (collection of audit committee meeting minutes), attached as Ex. 105 to Brown Steinberg Aff.; Perry Dep., at 392-93, attached as Ex. 105 to Brown Steinberg Aff. Although they knew that Ernest Grendi was a former partner at E & Y and that he and John LaBarca, the E & Y engagement partner, were social friends and former colleagues, see Perry Dep., at 42-45, attached as Ex. 110 to Brown Steinberg Aff., the audit committee defendants never questioned E & Y's independence or challenged the fact that LaBarca remained the engagement partner from the inception of JWP's relationship with E & Y through 1992. A reasonable jury could infer from this evidence that the audit committee defendants, in essence, abdicated their responsibilities and permitted Ernest Grendi free rein.
Plaintiffs also allege that the audit committee defendants were aware of a laundry list of dubious accounting practices that should have caused them to investigate and to uncover the massive fraud at JWP. We will not review these allegations or the evidence that plaintiffs cite in support thereof in any detail. Suffice it to say that reasonable minds could differ on the inferences to be drawn from that evidence. While we cannot say what a jury will make of these allegations, it is clear that evidence exists from which a reasonable jury could infer that the audit committee defendants acted with scienter.
The audit committee defendants contend, however, that the plaintiffs' evidence of scienter is insufficient because there is no evidence that the audit committee defendants had any motive to shut their eyes to the truth. They point out that each audit committee member held stock in JWP when it collapsed and lost substantial amounts of money. Motive is not an essential component of scienter, however. See Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128 (2d Cir.1994). Plaintiffs have satisfactorily demonstrated the existence of a question of fact on this issue by presenting evidence of the audit committee defendants' acts, or failures to act, from which a jury could infer fraudulent intent.
The audit committee defendants also contend that as a matter of law, the evidence presented by plaintiffs is insufficient to defeat a motion for summary judgment when it is considered in conjunction with evidence that E & Y repeatedly assured the audit committee defendants that JWP's financial affairs were in order and that JWP was, if anything, conservative in its accounting practices in certain crucial areas. The audit committee defendants are correct, of course, that one must take into account the totality of the circumstances in determining whether they acted with scienter. See Fischbach, 1992 *1258 WL 8715, at *3. In Fischbach, however, the court found that the plaintiff had submitted no evidence that would support an inference of fraudulent intent and that other circumstances demonstrated that such an inference was unwarranted. See id. Here, by contrast, we are confronted with some evidence that could support an inference of fraudulent intent and some evidence that counsels against drawing that inference. This, of course, means that there is a question of fact that should be resolved by a jury.

iii. Statute of Limitations
The audit committee defendants also move for summary judgment dismissing the AUSA plaintiffs' § 10(b) claim, as well as their other federal securities claims, on the ground that those claims are time-barred. The complaint in AUSA v. Dwyer was filed on September 30, 1993. The audit committee defendants join E & Y in arguing that the AUSA plaintiffs were on inquiry notice of their claims by some time in August 1992, more than one year earlier. As we determined above, the AUSA plaintiffs were clearly on inquiry notice of their claims against E & Y by August 14, 1992. Our reasoning also holds true for the AUSA plaintiffs' claims against the audit committee defendants. An issue of fact exists, however, concerning whether the AUSA plaintiffs conducted a reasonably diligent inquiry under the circumstances and therefore tolled the limitations period. This issue of fact precludes us from granting summary judgment on this ground.

2. Common Law Fraud
The class plaintiffs, the AUSA plaintiffs and the Aronoff plaintiffs have asserted claims for common law fraud against the audit committee defendants. In order to recover for common law fraud, the plaintiffs must establish: 1) the misrepresentation of a material fact, 2) made intentionally or recklessly in order to deceive the defrauded party, 3) justifiable reliance on the misrepresentation by the defrauded party, 4) causation and 5) damages. See Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1496 (2d Cir.1992); Morse v. Weingarten, 777 F.Supp. 312, 319 (S.D.N.Y.1991). The audit committee defendants seek summary judgment on the plaintiffs' claims for common law fraud on the ground that "[d]efendants owe plaintiffs no greater duty under New York common law than they do under § 10(b)." In re Time Warner, Inc. Securities Litigation, 794 F.Supp. 1252, 1264 (S.D.N.Y.1992), rev'd on other grounds, 9 F.3d 259 (2d Cir.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994). Therefore, they contend that we should dismiss plaintiffs' common law fraud claims for the same reasons that we should dismiss their § 10(b) claims. This argument is, for the most part, doomed to failure, as the audit committee defendants did not persuade us that they were entitled to summary judgment on the plaintiffs' § 10(b) claims, except to the extent that those claims were based on alleged misrepresentations that the audit committee defendants did not make.
Even with respect to that aspect of the plaintiffs' common law fraud claims, however, the audit committee defendants are not entitled to summary judgment. Under New York law, a defendant may be held liable for aiding and abetting common law fraud. See Dep't of Economic Dev. v. Arthur Andersen & Co., 924 F.Supp. 449, 482-83 (S.D.N.Y.1996). To recover on such a claim, the plaintiffs must demonstrate (1) the existence of a fraud, (2) the audit committee defendants' knowledge of the fraud and (3) their knowing rendition of substantial assistance thereto. See In re Investors Funding Corp. of N.Y. Securities Litigation, 523 F.Supp. 533, 545 (S.D.N.Y.1980) (Conner, J.). The plaintiffs have asserted claims against the audit committee defendants for aiding and abetting common law fraud. The audit committee defendants argue that there is no evidence that they knew of the fraud or that they substantially assisted anyone else in making the alleged misrepresentations. As we held above, however, plaintiffs have demonstrated the existence of a question of fact regarding whether the audit committee defendants acted with scienter. Genuine questions of material fact also exist concerning whether the audit committee defendants' alleged failure to fulfill their obligations and to discover the accounting fraud substantially *1259 assisted JWP's management in making the alleged misrepresentations.

3. Section 12(2)
The AUSA plaintiffs have asserted a claim against the audit committee defendants under § 12(2) based on alleged misrepresentations contained in the offering materials for each issue of JWP's debt securities. Section 12(2) imposes liability on any person who offers or sells a security "by means of a prospectus or oral communication" that contains a false or misleading statement or omission of a material fact. See 15 U.S.C. § 77l(2). In Gustafson v. Alloyd Co., ___ U.S. ___, ___-___, 115 S.Ct. 1061, 1073-74, 131 L.Ed.2d 1 (1995), the Supreme Court recently held that the term "prospectus" refers to a "document that describes a public offering of securities by an issuer or controlling shareholder." The audit committee defendants argue that they are entitled to summary judgment dismissing the AUSA plaintiffs' claim under § 12(2) because the offering documents at issue in this case do not satisfy this definition of "prospectus." We agree.
The difficulty in satisfying the standard established in Gustafson lies in the fact that JWP's offering documents did not describe public offerings. Instead, the pertinent information concerning JWP's offerings was set forth in private placement memoranda, pursuant to § 4(2) of the 1933 Act, 15 U.S.C. § 77d(2), which exempts from the 1933 Act's registration requirements "transactions by an issuer not involving any public offering." The AUSA plaintiffs' complaint acknowledges that JWP's notes were issued privately. See AUSA/Dwyer Complaint, at ¶¶ 43, 46(I), 49. Furthermore, JWP represents in the 1992 note agreements that it has provided the note purchasers with copies of the private placement memoranda prepared by the underwriters. See Ex. 11, at ¶ 8B(ii), attached to Brown Steinberg Aff. Hence, there is no doubt that JWP's notes were sold in private offerings. Courts in this district have held that under Gustafson, private placement memoranda like those at issue are not "prospectuses" for the purposes of a claim under § 12(2). See ESI Montgomery County, Inc. v. Montenay Int'l Corp., 899 F.Supp. 1061, 1064-65 (S.D.N.Y.1995); Glamorgan Coal Corp. v. Ratner's Group PLC, 1995 WL 406167, at *2-*3 (S.D.N.Y. July 10, 1995). We see no reason to disagree with these sound decisions, and we grant the audit committee defendants' motion for summary judgment dismissing the AUSA plaintiffs' § 12(2) claim.
The AUSA plaintiffs attempt to resurrect their § 12(2) claim by contending that JWP's private placement memoranda were so permeated by fraud that the exemption to registration under § 4(2) did not apply and the notes should have been sold in a registered offering. If the AUSA plaintiffs wish to contend that the note offerings should have been registered, however, the appropriate basis for that claim would be § 12(1), 15 U.S.C. § 77l(1), which provides for rescission of sales of securities improperly accomplished without registration. The AUSA plaintiffs have not asserted a claim under that provision.

4. Control Person Liability
All three sets of plaintiffs have asserted claims against the audit committee defendants under § 20 of the 1934 Act seeking to hold the audit committee defendants liable as control persons for the § 10(b) violations of others. See 15 U.S.C. § 78t. The audit committee members have moved for summary judgment dismissing these claims. We must engage in a two-part inquiry to determine whether control person liability should be imposed:
First, the court must ascertain whether the nature of the relationship between the purported controller and controllee is such that the defendant possesses the actual authority to influence and direct the activities of the primary wrongdoer. Second, even if the defendant has such authority, a defendant is not liable unless he is also a culpable participant in the fraud.
Travelers Insur. Co. v. Lewis, 756 F.Supp. 172, 177 (S.D.N.Y.1991) (citing Lanza v. Drexel & Co., 479 F.2d 1277, 1299 (2d Cir. 1973)). "Actual control means the `practical ability to direct the actions of [the controlled person].'" Epstein v. Haas Securities Corp., *1260 731 F.Supp. 1166, 1175 n. 5 (S.D.N.Y.1990) (internal citation omitted). The defendant need not have "actively exercised the control in the transaction in question." Id. The burden is on the defendant to demonstrate, as an affirmative defense, that it acted in good faith and therefore was not a culpable participant in the fraud. See Food & Allied Serv. Trades Dep't, AFL-CIO v. Millfeld Trading Co., 841 F.Supp. 1386, 1390 (S.D.N.Y.1994) (citing Marbury Management, Inc. v. Kohn, 629 F.2d 705, 716 (2d Cir.), cert. denied, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980)).
Plaintiffs have presented evidence from which a reasonable jury could conclude that the audit committee defendants had the authority to direct the actions of JWP and those persons involved in its financial reporting. The role of the audit committee, as described in JWP's 1987-91 proxy statements, was to oversee the independent auditor. In JWP's 1992 proxy statement, the description of the audit committee's duties was supplemented to include oversight of JWP's internal auditor and consultation with the independent auditor on matters relating to internal financial controls. The audit committee was also responsible for making appropriate reports and recommendations to the Board of Directors. Defendant Twining has stated that the audit committee's job "was to see that there was no monkey business going on and nothing was wrong with the accounting of the company, and that it was done in a proper businesslike and correct fashion." See Twining Dep., at 24, attached as Ex. 211 to Brown Steinberg Aff. Defendants O'Rourke, Duff and Perry have stated, respectively, that it was their responsibility to be "on watch," to see that the company "complie[d] with all laws, securities laws, other laws," and to "sound the alarm." See O'Rourke Dep., at 91; Duff Dep., at 26; Perry Dep., at 153; all attached as Ex. 211 to Brown Steinberg Aff.
From this information, a reasonable jury could perhaps conclude that JWP's audit committee performed an advisory function and that only the full Board of Directors, of which the audit committee defendants formed a minority, had the actual authority to influence and direct JWP's accounting policies. On the other hand, the audit committee was clearly the body charged with the specific responsibility of overseeing JWP's accounting and financial reporting and, therefore, with keeping JWP on the straight and narrow. A reasonable jury could find that the audit committee's recommendations would carry sufficient weight with the full Board, JWP's officers and E & Y that the audit committee had the practical ability to direct JWP's accounting policies. The audit committee defendants need not, of course, have actually exercised that authority to be held liable as control persons. Given the competing inferences that could be drawn from the evidence on this issue, we find that a question of fact exists concerning whether the audit committee defendants possessed the actual authority to control the actions of JWP and those persons involved in its financial reporting.
Furthermore, a question of fact exists concerning whether the audit committee defendants acted in good faith. The audit committee defendants contend that they relied in good faith on assurances from E & Y that everything was in order at JWP and that its accounting procedures were conservative. The plaintiffs have, however, presented evidence that raises a question of fact regarding whether the audit committee defendants were willfully blind to the fraud going on around them. Given that the jury must resolve this issue of fact concerning the audit committee defendants' intent, we cannot determine, as a matter of law, that they acted in good faith.
The AUSA plaintiffs have also asserted a claim under § 15 of the 1933 Act. Section 15 provides for control person liability based on violations by others of §§ 11 and 12 of the 1933 Act. See 15 U.S.C. § 77o. We have granted summary judgment dismissing the AUSA plaintiffs' claim under § 12(2) because the offering documents at issue in this case are not "prospectuses," and the AUSA plaintiffs have not made allegations that would support a claim under § 11. The AUSA plaintiffs therefore cannot demonstrate that a person controlled by the audit committee defendants committed a primary violation of *1261 § 11 or § 12. Accordingly, we grant summary judgment dismissing the AUSA plaintiffs' claim under § 15.

5. Negligent Misrepresentation
Both the AUSA plaintiffs and the Aronoff plaintiffs have asserted claims for negligent misrepresentation against the audit committee defendants. The audit committee defendants contend that they are entitled to summary judgment dismissing these claims on the ground that there is no evidence of the requisite special relationship between them and the AUSA plaintiffs or the Aronoff plaintiffs. Once again, the Credit Alliance standard provides the appropriate framework for our analysis. See Credit Alliance, 493 N.Y.S.2d at 443, 483 N.E.2d at 118; Time Warner, 9 F.3d at 271 (applying standard to negligent misrepresentation claim against officers and directors of company). It is undisputed that the audit committee defendants were not in privity with the AUSA plaintiffs or the Aronoff plaintiffs, and the audit committee defendants contend that there is no evidence of relationships that approached privity.
With respect to the AUSA plaintiffs' and the Aronoff plaintiffs' negligent misrepresentation claims based on statements made in documents, including JWP's Forms 10-K and its proxy statements, that were prepared for dissemination to the public and for filing with the SEC, we agree with the audit committee defendants. The representations in those documents were clearly not prepared for the particular purpose of inducing the AUSA plaintiffs to invest in JWP's notes or the Aronoff plaintiffs to sell their company to JWP in exchange for JWP's common stock. Instead, those representations were prepared for the purpose of satisfying JWP's obligations under the federal securities laws. Nor did JWP have any way of knowing who might rely on those publicly disseminated statements. Hence, to the extent that their negligent misrepresentation claims are based on statements contained in these documents, the AUSA plaintiffs and the Aronoff plaintiffs may not recover from the audit committee defendants. See In re Par Pharmaceutical, Inc. Securities Litigation, 733 F.Supp. 668, 686 (S.D.N.Y.1990).
We reach a different result with respect to representations that were made to the AUSA plaintiffs in the note agreements. The statements made in those agreements concerning JWP's financial condition were quite clearly intended to induce the AUSA plaintiffs to purchase JWP's notes. Furthermore, the Board of Directors, including the audit committee defendants, specifically authorized JWP's officers to sign the note agreements, which provides the requisite evidence of conduct that evinces the audit committee defendants' awareness that the AUSA plaintiffs would rely on the representations in the note agreements.
Whether the audit committee defendants were aware of the identities of the AUSA plaintiffs is open to some doubt. The audit committee defendants point out that the minutes of the Board of Directors' meetings at which the Board approved the note purchases refer, with one exception, only to "purchasers," rather than to specific institutional investors. See, e.g., Ex. 87, 89, 93, attached to Brown Steinberg Aff. Compare Ex. 91 (specific reference to Aegon), attached to Brown Steinberg Aff. Nevertheless, we find that a question of fact exists regarding whether the audit committee defendants knew the identities of the note purchasers. The minutes of the Board meetings reflect discussion of the proposed purchases. Drawing a reasonable inference from this evidence in the AUSA plaintiffs' favor, as we must, we conclude that a reasonable jury could infer that this discussion included the identities of the proposed purchasers of the notes. Indeed, given the size of the contemplated transactions, it would strike us as unusual if it did not.
The audit committee defendants also argue that statements contained in the note agreements cannot form the basis of the AUSA plaintiffs' claim for negligent misrepresentation because those statements duplicate representations made in JWP's publicly disclosed financial statements and SEC filings, which we have determined are not actionable. First, we note that not every alleged *1262 misrepresentation contained in the note agreements was drawn from a publicly disseminated document. For instance, JWP represented in the note agreements that as of the closing dates of the note purchases, it was not in default of any of the covenants in the note agreements. JWP also stated that the financial information that it had provided to the AUSA plaintiffs was "true and correct in all material respects" and fairly represented JWP's position. See, e.g., Ex. 11, at ¶¶ 3C, 8B, attached to Brown Steinberg Aff. Second, we believe that alleged misrepresentations that are not actionable if made in publicly disseminated documents may form the basis for a negligent misrepresentation claim when made in documents that are clearly intended for a limited audience. The focus of the Credit Alliance line of cases is on restricting to "fair, manageable bounds" the scope of the otherwise potentially unlimited liability that might attach to the maker of a negligent misstatement. See Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson, 73 N.Y.2d 417, 541 N.Y.S.2d 335, 337, 539 N.E.2d 91, 92-93 (1989). There is no indication that the Court of Appeals had any intention to immunize a defendant from liability to a plaintiff who relied on a negligent misrepresentation made under circumstances that satisfy the Credit Alliance standard simply because that misrepresentation also appeared elsewhere. Not surprisingly, the audit committee defendants do not cite a case that supports their contention.
Therefore, we grant the audit committee defendants' motion for summary judgment dismissing the negligent misrepresentation claims against them, except to the extent that the AUSA plaintiffs' claim is based on statements found in the note agreements.

6. Tortious Interference With Contract
The AUSA plaintiffs have asserted a claim against the audit committee defendants for tortious interference with contract. Under New York law, in order to recover for tortious interference with contract, the AUSA plaintiffs must establish: (1) the existence of a valid contract between them and a third party; (2) the audit committee defendants' knowledge of that contract; (3) the audit committee defendants' intentional procurement of the breach of that contract, and (4) damages. See G.D. Searle & Co. v. Medicore Communications, Inc., 843 F.Supp. 895, 910 (S.D.N.Y.1994). Generally speaking, an officer or director of a corporation
is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken.... [A] corporate officer who is charged with inducing the breach of a contract is immune from liability if it appears that he is acting in good faith as an officer [and did not commit] independent torts or predatory acts directed at another.
Murtha v. Yonkers Child Care Ass'n, Inc., 45 N.Y.2d 913, 411 N.Y.S.2d 219, 220, 383 N.E.2d 865, 865-66 (1978) (internal quotation omitted); see Searle, 843 F.Supp. at 911. The AUSA plaintiffs must also establish that the audit committee defendants' acts were taken outside the scope of their employment or that they personally profited from their acts. See Searle, 843 F.Supp. at 911; Courageous Syndicate, Inc. v. People-To-People Sports Committee, Inc., 141 A.D.2d 599, 529 N.Y.S.2d 520, 521 (1988). The audit committee defendants seek summary judgment on the grounds that they did not personally profit from the alleged breach of the note agreements between JWP and the AUSA plaintiffs, that they acted in good faith and within the scope of their positions and that their actions did not cause the alleged breach.
The audit committee defendants are correct that there is no evidence that they personally profited from the alleged breach. Indeed, in the final analysis, as JWP stockholders, the audit committee defendants lost money in the company's collapse. However, at the time of their alleged inducement of the breach, the audit committee defendants had an obvious economic incentive in concealing from the noteholders the truth about JWP's shaky financial condition. Thus, at the least, there are issues of fact with respect to whether the audit committee *1263 defendants acted in good faith and within the scope of their positions and whether they committed independent torts. As we explained above, issues of fact exist concerning whether the audit committee defendants acted with scienter in failing to discover JWP's allegedly fraudulent accounting practices. Certainly, if the audit committee defendants committed fraud, they were acting tortiously, outside the scope of their positions and in bad faith.
Furthermore, there is a cause-and-effect relationship between their alleged fraud and the alleged breach of the note agreements: the note agreements represent that JWP has furnished the AUSA plaintiffs with accurate financial information and provide that JWP will continue to do so as updated information becomes available during the terms of the notes. The fraud allegedly committed by the audit committee defendants could have caused JWP to provide financial information that was materially false and misleading, thereby breaching the note agreements.
Thus, plaintiffs have demonstrated that questions of fact exist concerning whether the audit committee defendants tortiously induced JWP to breach the note agreements.

C. Management Defendants
We may address the management defendants' summary judgment motions collectively with respect to two of their arguments. First, they seek summary judgment dismissing the AUSA plaintiffs' § 10(b) claims against them as time-barred. For the reasons set forth above in our discussion of the audit committee defendants' similar motion, their motions are denied. Second, the management defendants seek summary judgment dismissing the AUSA plaintiffs' claims under § 12(2) and § 15. Also for reasons outlined in our discussion of the audit committee defendants' similar motion, these motions are granted. The remaining aspects of the management defendants' motions require more detailed consideration.

1. Andrew Dwyer and Ernest Grendi
Andrew Dwyer was JWP's Chief Executive Officer from 1987 until April 1993 and Chairman of its Board of Directors from 1987 until June 1993. From 1985 until January 27, 1992, he was also JWP's President. Ernest Grendi served as JWP's Executive Vice President from 1984 until 1993 and as its Chief Financial Officer from 1984 until August 12, 1992. He was also a member of the Board of Directors from 1988 to 1993. The plaintiffs allege that Dwyer and Ernest Grendi were pivotal figures in the fraud at JWP. They each signed documents filed with the SEC, communicated with the AUSA plaintiffs and issued statements to the public. In addition, Ernest Grendi signed the officer's certificates that the note agreements required JWP to furnish to the AUSA plaintiffs prior to the closing of each note purchase, as well as a number of the no-default certificates issued quarterly thereafter.
Dwyer and Ernest Grendi seek summary judgment dismissing the plaintiffs' claims that they aided and abetted violations of the federal securities laws. To the extent that the plaintiffs' claims are based on factual allegations concerning statements that Dwyer and Ernest Grendi did not make, those allegations do not support claims for primary liability. Therefore, they are no longer viable following Central Bank and are dismissed.
Dwyer and Ernest Grendi also contend that we should grant summary judgment dismissing the AUSA plaintiffs' claim for tortious interference with contract. As we outlined above, however, if directors and officers of JWP induced JWP to breach the note agreements by acting in bad faith and outside the scope of their positions or if they committed independent torts, they may be held liable for tortious interference with contract. Dwyer and Ernest Grendi do not attempt to argue, for the purposes of this motion, that there is no evidence that they committed fraud. Certainly, if Dwyer and Ernest Grendi committed fraud, they were acting tortiously, outside the scope of their positions and in bad faith. Therefore, we deny their motion for summary judgment dismissing this claim.

2. Joseph Grendi
Joseph Grendi, Ernest Grendi's brother, is a certified public accountant who was employed *1264 by JWP from January 1989 until October 1992. During that period, he served at various times as Chief Financial Officer and Executive Vice-President of JWP Energy/Environmental, JWP International and JWP Mechanical/Electrical. Each of these entities was a subsidiary of JWP and was in turn composed of small groups of subsidiaries. In addition, he was temporarily appointed to the position of Chief Financial Officer of Businessland, Inc., a large computer and information services company that JWP acquired in August 1991.
The class plaintiffs, the AUSA plaintiffs and the Aronoff plaintiffs contend that at Ernest Grendi's direction, Joseph Grendi inspected the financial statements of JWP's businesses and "instructed those businesses to conceal certain operating expenses and forbid them to write off certain worthless assets in order to artificially inflate JWP's net income and assets, including inventory and accounts receivable." Class Plaintiffs' Complaint, at ¶ 18; Aronoff Plaintiffs' Complaint, at ¶ 27; AUSA/Dwyer Complaint, at ¶ 27.
While Joseph Grendi denies any wrongdoing and contends that the plaintiffs named him in these lawsuits solely because he is Ernest Grendi's brother, there is ample evidence in the record from which a reasonable jury could conclude that he was a pivotal player in the alleged fraud at JWP. For instance, an internal memorandum dated September 14, 1990, reports that in March 1990, Joseph Grendi instructed the CFO of a subsidiary of JWP Energy/Environmental to make an unsupported entry of $678,000. When JWP's internal auditor questioned the entry several months later, "Joe responded that earnings per share data was due for the first quarter and it was his time to be creative." Ex. 65, attached to Harwood Aff. In addition, there is evidence that in 1991, Joseph Grendi directed two British subsidiaries of JWP International to record over £4 million worth of claims, receivables and fixed assets when there was no basis for recording those items. See Ex. 74, attached to Harwood Aff. Furthermore, Joseph Grendi was responsible for formulating the policy by which certain JWP subsidiaries accounted for their small tools. See Ex. 126, attached to Harwood Aff. Plaintiffs contend that this policy caused JWP improperly to carry approximately $16 million in assets on its books.
These are just a few examples of the evidence that plaintiffs cite that could support the conclusion that Joseph Grendi was deeply involved in the alleged fraud. Indeed, David Sokol has testified that the results of his investigation into JWP's accounting practices revealed that:
[A] determination would be made between Mr. Dwyer and Ernie Grendi as to what the income of the company should be.... [E]ither Ernie or Joe Grendi or Andy [Dwyer] would make modifications to the preliminary numbers through methods like this by spreading around small, in many cases, increments throughout the books that were baseless. And that created the modifications that then modified the net income to meet those objectives.
Ex. 123, at 1636, attached to Affidavit of Daniella Quitt, dated Feb. 20, 1996.
All three sets of plaintiffs assert claims against Joseph Grendi under §§ 10(b) and 20 and for common law fraud. The AUSA plaintiffs and the Aronoff plaintiffs each add claims for negligent misrepresentation, and AUSA plaintiffs also assert a claim for tortious interference with contract. Joseph Grendi has moved for summary judgment on each of these claims.

a. Section 10(b)
The plaintiffs base their § 10(b) claims against the management defendants on the misstatements that they allege that JWP and its management made in JWP's SEC filings, consolidated financial statements, press releases and reports, note agreements, no-default certificates, annual reports, proxy statements and face-to-face meetings with certain plaintiffs. It is undisputed that Joseph Grendi did not sign, or explicitly authorize the signing of, any of the documents that JWP filed with the SEC, disseminated to the public or provided to the AUSA plaintiffs or to the Aronoff plaintiffs. It is also undisputed that Joseph Grendi did not make any oral statements to the AUSA plaintiffs or to the Aronoff plaintiffs and that *1265 none of the statements quoted in press releases or reports was attributed to him. Joseph Grendi argues that the plaintiffs have therefore failed to present evidence from which a reasonable jury could find that he made any of the alleged misrepresentations. Hence, he contends that under the Supreme Court's ruling in Central Bank, he is entitled to summary judgment dismissing the plaintiffs' § 10(b) claims because he cannot be held liable for a primary violation.
To counter this argument, the plaintiffs cite two cases in which courts in this district have specifically stated that a party may be held primarily liable under § 10(b) for providing fraudulent raw data on which false or misleading statements are based, even if someone else actually made the misleading statements to investors. See In re Union Carbide Corp. Consumer Prods. Business Securities Litigation, 676 F.Supp. 458, 468-69 (S.D.N.Y.1987); In re Kidder Peabody Securities Litigation, 1995 WL 590624, at *9 (S.D.N.Y. Oct. 4, 1995). Plaintiffs contend that Central Bank did not purport to change the established standard for primary liability, as set forth in Union Carbide and Kidder Peabody, and that Joseph Grendi may be held primarily liable as a direct participant in the alleged fraud because he provided fraudulent raw data that caused JWP's consolidated financial statements to be materially false and misleading.
Joseph Grendi argues vehemently that plaintiffs' reasoning is simply an impermissible attempt to recast an aiding and abetting claim as a claim asserting primary liability. Essentially, Joseph Grendi argues that he cannot be held primarily liable under § 10(b) unless he signed the alleged misrepresentation or unless it was otherwise directly attributed to him. In support of this argument, he cites cases in which courts have held that following Central Bank, accountants and underwriters may not be held liable under § 10(b) unless they actually made misrepresentations. See Anixter, 77 F.3d at 1225-27; MTC, 898 F.Supp. at 985-87; Kendall, 868 F.Supp. at 27-28. Each of these cases considered circumstances in which the accountants and underwriters either had made affirmative statements, which were contained in documents that they signed, or had made no affirmative representations at all. None of these cases, however, addressed the question presented in this case: whether a defendant may be held primarily liable for making affirmative misrepresentations that are not signed by or directly attributed to the defendant but that form the basis of allegedly false or misleading statements made to investors by others. Therefore, none of the cases that Joseph Grendi cites provides persuasive support for his position. Instead, we reach the result that he advocates by a different route.
We need not consider whether the holding of Central Bank vitiates the rule articulated in Union Carbide and Kidder Peabody.[9] Assuming that the plaintiffs are correct that despite Central Bank, the provision of fraudulent raw data may support a claim for primary liability under § 10(b), their argument is nonetheless unsuccessful in this case. There is a crucial distinction between the plaintiffs' claims and Kidder Peabody. In Kidder Peabody, which was decided on a motion to dismiss, the court accepted as true allegations in the complaint that the movant had made affirmative financial misrepresentations. See Kidder, 1995 WL 590624, at *9 (referring to allegations that defendant personally entered fraudulent trades in brokerage's computers). Here, by contrast, the plaintiffs have failed to present evidence of specific facts from which a jury could conclude that Joseph Grendi personally made affirmative financial misrepresentations, either at the subsidiary level or at the corporate level.
The plaintiffs' memoranda consistently contend that Joseph Grendi directed the *1266 CFOs of the various JWP subsidiaries under his supervision to make unsupported and improper accounting entries and that he developed policies that when applied at the subsidiary level, caused JWP's books to overstate assets and to understate liabilities. See Class Plaintiffs' Memorandum, at 58-61; AUSA Plaintiffs' Memorandum, at 51-56. Only occasionally, in lengthy discussions of the evidence bearing on Joseph Grendi's actions, do the plaintiffs assert that Joseph Grendi himself made affirmative misrepresentations in JWP's or its subsidiaries' books. Their contentions are not supported by the documents to which they refer,[10] which simply contain more evidence that Joseph Grendi orchestrated the alleged fraud by directing others to make improper entries.[11] Therefore, the plaintiffs have failed to demonstrate that a triable issue of fact exists concerning Joseph Grendi's primary liability under § 10(b). Accordingly, we grant Joseph Grendi's motion for summary judgment dismissing the plaintiffs' § 10(b) claims against him.

b. Control Person Liability
The purpose of control person liability is to prevent individuals who orchestrate or direct a securities fraud, but who do not actually commit the fraudulent acts themselves, from escaping liability. Therefore, it is no surprise that the AUSA plaintiffs, the class plaintiffs and the Aronoff plaintiffs have asserted claims under § 20 seeking to hold Joseph Grendi liable as a control person for the § 10(b) violations of others. The AUSA plaintiffs and the Aronoff plaintiffs contend that Joseph Grendi controlled JWP, while the class plaintiffs contend that Joseph Grendi controlled JWP, John McQuade (JWP's Senior Vice President Finance) and Philip McGinn (JWP's Controller and Chief Accounting Officer). See Ex. I, at 24-25, attached to Affidavit of Jeffrey W. Davis, dated Jan. 5, 1996.
Joseph Grendi asserts that he is entitled to summary judgment dismissing these claims on several grounds. First, with respect to the plaintiffs' claims that he is liable because he controlled JWP, he argues that there is no evidence that he possessed actual control over JWP. Joseph Grendi contends that he was merely a junior officer at the subsidiary level and therefore cannot have had the authority to influence or direct JWP's actions or policies. While there is no dispute that formally speaking, Joseph Grendi held positions only at the subsidiary level, that fact is not dispositive on summary judgment. Instead, the crucial issue is whether the plaintiffs have presented evidence from which a reasonable jury could conclude that Joseph Grendi possessed the "`practical ability to direct the actions of [JWP].'" Epstein, 731 F.Supp. at 1175 n. 5 (internal citation omitted). We conclude that they have done so. For instance, there is evidence that Joseph Grendi developed JWP's policy for accounting for small tools and caused it to be implemented at several subsidiaries. There is also evidence that he ordered specific accounting adjustments at various subsidiaries and that he possessed *1267 sufficient authority to induce reluctant CFOs at some of those subsidiaries to accede to his requests. Indeed, he may have obtained the transfer of one subsidiary-level CFO who objected to his directions and threatened to fire another. See Aleksa Dep., at 283-84, attached as Ex. 64 to Harwood Aff.; Sweitzer Dep., at 75-77, attached as Ex. 127 to Harwood Aff. Given this information, which is only a sampling of the evidence of Joseph Grendi's activities that the plaintiffs have presented, there is clearly evidence from which a reasonable jury could conclude that Joseph Grendi exercised actual control over JWP's procedures and activities.
Joseph Grendi next argues that he may not be subject to control person liability based on the activities of McGinn and McQuade because the class plaintiffs have failed to allege that McGinn and McQuade committed primary violations of the securities laws. This argument is more persuasive. While the class plaintiffs need not name McGinn and McQuade as defendants in order to recover under § 20, they must at least allege that McGinn and McQuade committed primary violations. See In re Citisource, Inc. Securities Litigation, 694 F.Supp. 1069, 1072, 1077 (S.D.N.Y.1988) (holding that plaintiff need not name alleged primary violators as defendants but describing detailed allegations of their wrongdoing contained in complaint). The class plaintiffs' complaint is, however, devoid of such allegations.
Joseph Grendi also argues that as a matter of law, he cannot be held liable as a control person because he was, as the class plaintiffs themselves contend, controlled by the other management defendants. See Ex. I, at 24-25, attached to Davis Aff. The class plaintiffs counter that the same person may have the authority to exercise control in some situations while being controlled in others. We decline to resolve this issue at this juncture.[12] It is sufficient for our current purposes to note that questions of fact exist that a jury must resolve regarding whether Joseph Grendi was a controlled person, a controlling person or, perhaps, both.
Accordingly, Joseph Grendi's motion for summary judgment dismissing the plaintiffs' claims under § 20 is denied.

c. Common Law Fraud
The AUSA plaintiffs, the Aronoff plaintiffs and the class plaintiffs have asserted claims against Joseph Grendi for common law fraud. He argues that we should grant summary judgment dismissing these claims because the plaintiffs have failed to demonstrate that he made any misrepresentations. This argument fails.
Under New York law, corporate officers and directors may be liable for common law fraud where they personally participate in the alleged misrepresentation or where they have actual knowledge of the alleged misrepresentation. See Marine Midland Bank v. John E. Russo Produce Co., 50 N.Y.2d 31, 427 N.Y.S.2d 961, 968-69, 405 N.E.2d 205, 211-13 (1980); Travelers, 756 F.Supp. at 179-80. Clearly, a reasonable jury could conclude that Joseph Grendi had actual knowledge that JWP's consolidated financial statements and SEC filings contained misrepresentations, since the plaintiffs have presented evidence that would support a finding that Joseph Grendi personally directed employees of JWP and its subsidiaries to make allegedly fraudulent accounting entries.
Furthermore, the plaintiffs have asserted claims against Joseph Grendi for aiding and abetting common law fraud. Even if the jury concludes that plaintiffs have failed to establish that Joseph Grendi committed common law fraud, he could still be held liable for aiding and abetting common law fraud. Joseph Grendi does not argue that the plaintiffs have failed to present evidence that demonstrates that questions of fact preclude summary judgment on this claim.
Accordingly, Joseph Grendi's motion for summary judgment dismissing the plaintiffs' common law fraud claims is denied.

*1268 d. Negligent Misrepresentation
The Aronoff plaintiffs and the AUSA plaintiffs have asserted claims against Joseph Grendi for negligent misrepresentation. Because they have failed to present evidence that he made any misrepresentations, we grant Joseph Grendi's motion for summary judgment dismissing those claims.

e. Tortious Interference With Contract
The AUSA plaintiffs have asserted a claim for tortious interference with contract against Joseph Grendi. He seeks summary judgment on this claim on the grounds that there is no evidence that he caused the alleged breach of the note agreements between JWP and the AUSA plaintiffs or that he intended to induce the alleged breach.
The AUSA plaintiffs have demonstrated that an issue of fact exists concerning whether Joseph Grendi's actions caused JWP to breach the note agreements. JWP's obligations under the note agreements included keeping proper books and records, maintaining appropriate reserves and providing accurate financial information to the AUSA plaintiffs on a timely basis. See, e.g., Ex. 11, at ¶¶ 5A, 5F, attached to Brown Steinberg Aff. If the jury concludes that as a result of Joseph Grendi's activities, JWP's books were not kept properly, its reserves were inadequate or its financial information was false or misleading, his actions would have caused JWP to breach the note agreements.
The AUSA plaintiffs have failed, however, to demonstrate that there is evidence from which a reasonable jury could conclude that Joseph Grendi intended to induce the alleged breach. The AUSA plaintiffs have not presented any evidence that Joseph Grendi was even aware of the note agreements, much less that he intentionally induced JWP's alleged breach. See AUSA Plaintiffs' Memorandum, at 256 (citing no evidence that would establish scienter).
Therefore, Joseph Grendi's motion for summary judgment dismissing the AUSA plaintiffs' claim for tortious interference with contract is granted.

D. Joseph Gallo
Joseph Gallo joined JWP in August 1988 as its Treasurer. In that capacity, he oversaw JWP's cash management system and dealt with its bank lenders. On November 21, 1991, the Board of Directors made him a Vice President "in order to allow him to execute compliance reports to the Company's lenders." See Ex. 47, at 17, attached to Steinberg Aff. He subsequently issued nodefault certificates on November 25, 1991, March 23, 1992, May 22, 1992, and August 26, 1992. At some point in 1991, Gallo began to function as a liaison between JWP and its institutional investors. In that capacity, he attended due diligence meetings, worked with JWP's investment banker and fielded questions from institutional investors. Gallo also oversaw JWP's relationships with its insurance carriers and, beginning in 1990, served as President of JWP's captive insurance company. Unlike the other individual defendants, Gallo remained employed at JWP throughout the investigation into the alleged accounting fraud and JWP's bankruptcy proceeding. He is currently the Treasurer and a Senior Vice President of EMCOR, Inc., which is the name under which JWP emerged from bankruptcy.
The AUSA plaintiffs have asserted claims against Gallo under §§ 10(b), 12(2), 15 and 20. They have also brought claims for common law fraud, negligent misrepresentation and tortious interference with contract. Essentially, the AUSA plaintiffs contend that the no-default certificates that Gallo issued and the statements that he made to their representatives both before and after the note purchases were false and misleading. Joseph Gallo has moved for summary judgment on all of the claims against him.

1. Section 10(b)
The AUSA plaintiffs' § 10(b) claim against Gallo is based on the 1990 note purchases, which involved Bankers United Life Assurance Company, Life Investors Insurance Company of America, AUSA Life Insurance Company, General Services Life Insurance Company (collectively, along with Monumental Life Insurance Company, "Aegon") and Prudential Life Insurance Company of *1269 America ("Prudential"), and the 1992 note purchase, which involved Prudential and Modern Woodmen of America ("Modern Woodmen"). Gallo contends that he is entitled to summary judgment dismissing this claim on the grounds that there is no evidence that he made any misrepresentations, that even if he did, those misrepresentations were not material, that there is no evidence that he acted with scienter, that the AUSA plaintiffs could not have reasonably relied on the alleged misrepresentations and that the alleged misrepresentations were not made in connection with the AUSA plaintiffs' note purchases.

a. Existence of Misrepresentations
First, Gallo contends that there is no evidence that he made any misrepresentations to Aegon, Prudential and Modern Woodmen prior to their note purchases.[13] With respect to the 1990 note purchases, Gallo is correct. Neither Aegon's nor Prudential's due diligence memorandum lists Gallo as a participant in the due diligence meeting. See Ex. 34, 35, attached to Steinberg Aff. Moreover, Aegon's and Prudential's representatives do not recall speaking with Gallo prior to the 1990 note purchases. See Hogan Dep., at 24-25, 27-28 (Aegon), attached as Ex. 90 to Steinberg Aff.; Lumpris Dep., at 321 (Prudential), attached as Ex. 96 to Steinberg Aff.; Heintz Dep., at 507-10 (Prudential), attached as Ex. 189 to Brown Steinberg Aff. Likewise, there is no evidence that Gallo made any misrepresentations to Modern Woodmen prior to its 1992 note purchase. The analyst from Modern Woodmen who attended the due diligence meetings for that purchase did not recall whether Gallo was present and did not testify about communicating with him. See Caldwell Dep., at 54-55, 74-75, attached as Ex. 81 to Steinberg Aff.
Turning to Prudential's claim based on its 1992 note purchase, Prudential contends that the no-default certificates that Gallo issued on November 25, 1991, which Prudential received pursuant to the note agreements for its 1989 and 1990 purchases of JWP's notes, were false and misleading. Those certificates state that "to the best of [Gallo's] knowledge, as of September 30, 1991, no event has occurred which would constitute an event of default under the terms of the purchase agreement." See Ex. 42, attached to Steinberg Aff. Gallo argues that there is no evidence that he had knowledge of any default when he signed the certificates. Therefore, he maintains, the AUSA plaintiffs have failed to point out evidence that the no-default certificates were false or misleading. While the AUSA plaintiffs have not presented any conclusive documentary evidence demonstrating that Gallo had knowledge of any defaults when he issued the certificates, there is, as we explain below, evidence from which a jury could reasonably infer that Gallo knew or was willfully blind to the fact that JWP did not, for example, keep proper books and records or set appropriate reserves. Those failures would place JWP in violation of the note agreements. See, e.g., Ex. 9, at ¶ 5F, attached to Brown Steinberg Aff. Therefore, a question of fact exists regarding whether the no-default certificates were false or misleading.[14]

b. Materiality
Gallo next contends that as a matter of law, the statements that he made in the *1270 November 1991 no-default certificates were not material because they were stale. The November 1991 no-default certificates stated that JWP was in compliance with the relevant note agreements as of September 30, 1991. See Ex. 42, attached to Steinberg Aff. On March 6, 1992, the date of the closing for Prudential's 1992 note purchase, JWP provided Prudential with a certificate signed by Ernest Grendi stating that as of that date, JWP was not in default of any of the covenants in the 1992 note agreement. See Ex. 41, attached to Steinberg Aff. Gallo argues that this closing certificate superseded the November 1991 no-default certificates and rendered those certificates immaterial as a matter of law. While there is no doubt that at some point, an alleged misrepresentation becomes stale, we cannot say that the statements in the November 1991 no-default certificates were "so obviously unimportant to investors that reasonable minds could not differ on the question of materiality." In re Kidder Peabody Securities Litigation, 1995 WL 590624, at *5 (S.D.N.Y. Oct. 4, 1995); compare Rand v. Cullinet Software, Inc., 847 F.Supp. 200, 210 (D.Mass.1994). Therefore, the issue of whether, under the circumstances of this case, the November 1991 no-default certificates were stale when Prudential made its 1992 note purchase is a question of fact for the jury to decide.

c. Scienter
Gallo contends that the AUSA plaintiffs have also failed to present evidence that raises a triable issue of fact concerning whether he acted with scienter. As we explained above, it is typically inappropriate to decide issues of intent and motive on summary judgment, unless the nonmovant has failed to adduce any evidence from which a reasonable jury could infer that the defendant acted with scienter. See Wechsler, 733 F.2d at 1058-59; McMahan, 859 F.Supp. at 753. Although the evidence presented by the AUSA plaintiffs is certainly not overwhelming, we believe that it is sufficient to demonstrate that a question of fact exists on this issue.
For instance, there is some evidence that Gallo knew or was willfully blind to the fact that JWP was in default of its obligations under its note agreements with Prudential to keep proper books and records and to set appropriate reserves. See, e.g., Ex. 9, at ¶ 5F, attached to Brown Steinberg Aff. Gallo served as the president of JWP's captive insurance subsidiary beginning in 1990. That subsidiary was required by state law to include an amount in its reserves sufficient to cover incurred but not reported ("IBNR") losses on various types of claims. JWP, however, did not include an amount for IBNR losses on general liability claims in the insurance reserves recorded on its books at the corporate level. See McQuade Dep., at 291, attached as Ex. 188 to Brown Steinberg Aff. Plaintiffs contend that this practice was not in accordance with generally accepted accounting principles. As part of its restatement of its 1991 audited consolidated financial statement, JWP wrote off $4.6 million in order to increase its insurance reserves for IBNR losses. For the same reason, JWP also wrote off $3.7 million in its restatement of its unaudited consolidated financial statement from the first quarter of 1992. See Ex. 188, attached to Brown Steinberg Aff.
There is conflicting testimony regarding Gallo's role in setting the amount of JWP's insurance reserves. Gallo contends that he was not involved in calculating the insurance reserves beyond providing some background information that the AUSA plaintiffs have neither identified nor alleged was false. See Gallo Aff., at ¶ 10; Gallo Dep., at 349-50, attached as Ex. 86 to Steinberg Aff.; Gallo Reply Memorandum, at 21. On the other hand, John McQuade, who has acknowledged that he was involved in calculating the insurance reserves, has testified that Gallo, McGinn and Ernest Grendi made the decision not to record reserves for IBNR losses on general liability claims. See McQuade Dep., at 292, 665-66, attached as Ex. 188 to Brown Steinberg Aff.; see also Blount Dep., at 340-41, attached as Ex. 50 to Brown Steinberg Aff. (testimony of JWP's accounting manager that reserve position "was handled" between Gallo, McGinn, McQuade and Ernest Grendi). But see Blount Dep., at 949, attached as Ex. 80 to Steinberg Aff. (testimony of JWP's accounting manager that McGinn, not Gallo, was responsible for insurance reserves).
*1271 Moreover, John Gaeta, JWP's internal auditor during 1991, testified that Gallo may have attended one or more lunches during 1991 with members of JWP's accounting department and internal audit staff at which certain individuals expressed their concerns regarding JWP's policies on various accounting issues, including its treatment of goodwill, claims, inventory and valuation of certain assets. See Gaeta Dep., at 23-26, 409, attached as Ex. 197 to Brown Steinberg Aff.; see also Aleksa Dep., at 114-16, attached as Ex. 79 to Steinberg Aff. (stating that Gallo attended lunches on rare occasions). Gallo has acknowledged that he occasionally had lunch with Gaeta and Aleksa in 1991 but has asserted that he does not recall anyone discussing concerns about accounting matters. See Gallo Dep., at 151-52, attached as Ex. 86 to Steinberg Aff.; Gallo Aff. at ¶ 32.
This conflicting testimony is sufficient to demonstrate that there is evidence from which a reasonable jury could infer that Gallo knew of or recklessly disregarded JWP's failure to keep proper books and records or to maintain appropriate reserves. Having identified this issue of fact, which precludes a grant of summary judgment on the ground that Gallo did not act with scienter, we need not consider the AUSA plaintiffs' remaining assertions on this point.

d. Reliance
Pamela Jackson, a Prudential representative, has testified that she reviewed a number of no-default certificates issued by JWP while evaluating the advisability of Prudential's 1992 note purchase. See Jackson Dep., at 507-08, attached as Ex. 7 to Fontak Aff. A reasonable jury could infer that the November 1991 no-default certificates were among those that Jackson reviewed. Gallo contends, however, that as a matter of law, the AUSA plaintiffs cannot demonstrate that their alleged reliance on those certificates was reasonable because the November 1991 no-default certificates stated that "to the best of [Gallo's] knowledge," JWP was not in default.
Gallo is undoubtedly correct that this statement is a more limited representation than an unqualified declaration that JWP is not in default. That fact does not, however, lead ineluctably to the conclusion that as a matter of law, Prudential cannot have reasonably relied on the November 1991 no-default certificates. Under the circumstances of this case, a reasonable jury could conclude that Prudential reasonably assumed, based on Gallo's position at JWP, that he would know if JWP were in default of its obligations under the note agreements. Of course, a reasonable jury could also be swayed by the testimony given by Prudential's representatives that indicates that they never sought any information about Gallo's role at JWP but simply assumed that he was in a position to give them reliable information. See Jackson Dep., at 478-80, 507, attached as Ex. 91 to Steinberg Aff.; Klamka Dep., at 737, attached as Ex. 94 to Steinberg Aff.; Trabka Dep., at 389-92, attached as Ex. 100 to Steinberg Aff. The AUSA plaintiffs may therefore be unable to persuade the jury that Prudential's reliance was reasonable. That determination is, however, for the jury.

e. In Connection With
Finally, Gallo asserts that the November 1991 no-default certificates that he signed were not issued in connection with Prudential's 1992 note purchase. As we explained above in addressing E & Y's analogous argument that the no-default certificates that it issued failed to satisfy the "in connection with" requirement, the November 1991 no-default certificates clearly contain the sort of representations that are directly pertinent to Prudential's 1992 note purchases. Therefore, the alleged misrepresentations in the November 1991 no-default certificates satisfy the "in connection with" requirement.
Accordingly, we grant summary judgment dismissing the AUSA plaintiffs' § 10(b) claim against Gallo, except to the extent that their claim is based on alleged misrepresentations that Gallo made to Prudential prior to its 1992 note purchase.

2. Section 12(2)
Gallo seeks summary judgment dismissing the AUSA plaintiffs' claims against him under § 12(2). For reasons outlined in our discussion of the audit committee defendants' similar motion, Gallo's motion is granted.

*1272 3. Control Person Liability
Gallo contends next that he is entitled to summary judgment on the AUSA plaintiffs' claim that he is liable under § 20 because he controlled JWP. Gallo argues that there is no evidence that he possessed the practical ability to influence and direct the activities of JWP. We agree.
The AUSA plaintiffs do not dispute that until March 1992, Gallo reported to McQuade, JWP's Senior Vice President-Finance, who reported to Ernest Grendi who in turn reported to Andrew Dwyer.[15]See Gallo Dep., at 330-31, attached as Ex. 86 to Steinberg Aff. Although federal regulations require that JWP list all individuals with significant policy making roles as executive officers on its Forms 10-K, Gallo was not one of the people named. See Ex. 20-23 (JWP's 1988-91 Forms 10-K), attached to Steinberg Aff. The AUSA plaintiffs have presented no evidence that contradicts Gallo's sworn testimony that he never attended meetings of the Board of Directors or of the executive committee. See Gallo Aff., at ¶ 6.
The AUSA plaintiffs have pointed out only one specific area  the insurance reserves  in which they contend that Gallo established a policy that resulted in fraudulent accounting. However, even if Gallo was involved in setting JWP's insurance reserves, which he disputes, the most that can be said of the evidence on this issue is that it tends to show that Gallo, McQuade, McGinn and Ernest Grendi established JWP's policy for recording insurance reserves. As McQuade and Ernest Grendi were both senior to Gallo, we do not believe that a reasonable jury could conclude that Gallo had the practical authority to set that policy. In contrast to the evidence concerning Joseph Grendi, there is no indication that Gallo exercised authority beyond what one would expect from someone in his position. For example, there is no evidence that Gallo wielded sufficient influence within the company to compel other JWP employees to make fraudulent accounting entries. Hence, we conclude that Gallo did not have the practical ability to direct JWP's actions in any way relevant to this case.
Therefore, Gallo is entitled to summary judgment dismissing the AUSA plaintiffs' claim against him under § 20. In addition, as we explained above in addressing the audit committee defendants' similar motion, we must also dismiss the AUSA plaintiffs' claim against Gallo under § 15.

4. Common Law Fraud
The AUSA plaintiffs have asserted claims for common law fraud and for aiding and abetting common law fraud against Gallo. These claims are based on the 1988 note transaction, which involved Mutual Life Insurance Company of New York ("MONY"), Crown Life Insurance Company and Aegon, the 1989 note transactions, which involved MONY, Crown Life and Prudential, and the 1990 and 1992 note transactions discussed above. Gallo, reiterating many of the arguments that he made regarding the AUSA plaintiffs' § 10(b) claim, contends that he is entitled to summary judgment dismissing the AUSA plaintiffs' common law fraud claims. The AUSA plaintiffs' memorandum of law does not directly address Gallo's arguments with respect to their common law fraud claims against him. Nevertheless, we find that issues of fact preclude summary judgment on certain aspects of these claims. For the sake of analytical convenience, we discuss the AUSA plaintiffs' evidence concerning statements that Gallo made prior to the note purchases separately from the evidence relating to statements that he made after the purchases occurred.
First, with respect to pre-purchase statements, the AUSA plaintiffs have presented no evidence that contradicts Gallo's testimony that he had no involvement in the 1988 note transaction. See Gallo Aff., at ¶ 11. Furthermore, the representatives of Prudential, Crown Life and MONY did not testify to any communications that they had with Gallo prior to the 1989 note transaction. See Walton *1273 Dep., at 640-42 (MONY), attached as Ex. 101 to Steinberg Aff.; Kidnie Dep., at 195-97, 341 (Crown Life), attached as Ex. 93 to Steinberg Aff.; Lumpris Dep., at 321 (Prudential), attached as Ex. 96 to Steinberg Aff.; Heintz Dep., at 508 (Prudential), attached as Ex. 189 to Brown Steinberg Aff. Moreover, we reiterate that there is no evidence that prior to the 1990 note purchases, Gallo made any representations to Prudential or to Aegon. Nor is there any evidence that prior to the 1990 note transaction, Gallo had actual knowledge of the fraud allegedly perpetrated by other members of JWP's management. See Marine Midland, 427 N.Y.S.2d at 968-69, 405 N.E.2d at 211-13 (corporate officers may be liable for fraud if they personally participated in misrepresentation or had actual knowledge of it); Investors Funding, 523 F.Supp. at 545 (one element of liability for aiding and abetting common law fraud is knowing rendition of substantial assistance to fraud). Hence, Gallo is entitled to summary judgment dismissing this portion of the AUSA plaintiffs' common law fraud claims.
As we discussed above, however, Gallo made statements to Prudential prior to its 1992 note purchase that a reasonable jury could conclude were false and misleading. Furthermore, also for reasons that we discussed above, questions of fact exist on the issues of materiality, scienter and reliance that preclude the grant of summary judgment dismissing this portion of the AUSA plaintiffs' common law fraud claim against Gallo. Moreover, although Gallo did not make any statements to Modern Woodmen prior to its 1992 note purchase, the evidence presented by the AUSA plaintiffs is sufficient to permit a reasonable jury to infer that Gallo had actual knowledge of the alleged accounting fraud perpetrated by other JWP officers and directors. Therefore, this portion of the AUSA plaintiffs' claim for common law fraud also survives summary judgment.
Turning to the AUSA plaintiffs' contentions regarding Gallo's post-purchase statements, there are numerous questions of fact that prevent a grant of summary judgment on this aspect of the AUSA plaintiffs' common law fraud claim. Each of the AUSA plaintiffs received no-default certificates dated November 25, 1991 (except Modern Woodmen), March 23, 1992, May 22, 1992, and August 26, 1992. For the reasons that we outlined in our discussion of the AUSA plaintiffs' § 10(b) claim against Gallo, questions of fact exist regarding whether these certificates were materially misleading, whether the AUSA plaintiffs reasonably relied on them and whether Gallo acted with scienter. Indeed, for the later certificates, which were issued after the alleged accounting irregularities at JWP began to come to light, there is, if anything, more reason to infer that the no-default certificates were materially misleading and that Gallo acted with scienter, although there may be less support for the AUSA plaintiffs' contention that their reliance on the no-default certificates was reasonable. These are clearly questions for the jury to resolve.
Gallo apparently had several conversations with Prudential's representatives during the late summer and fall of 1992 in which he attempted to explain the dramatic events at JWP. Gallo contends that he did not make any false or misleading statements to Prudential's personnel. He also asserts that there is no evidence that he acted with scienter, as he was kept in the dark by JWP's senior management. In addition, he argues that under the circumstances, it was unreasonable as a matter of law for Prudential to rely on his statements and that Prudential's assertion that he failed to provide them with requested information further undermines their contentions of reasonable reliance. The AUSA plaintiffs contend that Gallo gave them misleading or incomplete information calculated to convince them that JWP was basically a solid company and that the company's difficulties had been caused by the general economic downturn and a power struggle between Dwyer and Sokol. This dispute also clearly presents questions for the jury.
Finally, there are questions of fact concerning whether the AUSA plaintiffs were damaged by Gallo's post-purchase no-default certificates and whether Prudential was damaged by Gallo's communications with its representatives in the late summer and fall of *1274 1992. Gallo contends that the AUSA plaintiffs have failed to demonstrate that they suffered any losses as a result of his post-purchase statements. The AUSA plaintiffs assert that if they had not been misled by statements made by JWP's management, including those made by Gallo, they would have attempted to renegotiate the notes, to sell them to less risk-averse investors, to secure a share of the proceeds from some of JWP's asset sales or perhaps to accelerate the notes in accordance with the terms of the note agreements. They contend that any of these steps could have decreased the losses that they have suffered. While we agree with Gallo that these alleged losses may be difficult to quantify precisely, we cannot say that there is no evidence that the AUSA plaintiffs were damaged by the alleged misrepresentations nor can we say that their damage theories are purely speculative. Accordingly, a question of fact exists on the issue of what damages, if any, the AUSA plaintiffs suffered as a result of Gallo's post-purchase statements.
Therefore, we deny Gallo's summary judgment motion on the AUSA plaintiffs' common law fraud claim against him to the extent that it is based on the no-default certificates provided to the AUSA plaintiffs and on the statements that Gallo made to Prudential's representatives.

5. Negligent Misrepresentation
The AUSA plaintiffs also assert a claim for negligent misrepresentation against Gallo based on the no-default certificates that he issued and the statements that he made to Prudential's representatives. Gallo argues that the AUSA plaintiffs have failed to present evidence that the requisite relationship of privity or near privity exists between Gallo and the AUSA plaintiffs. We disagree. Although it is undisputed that Gallo was not in privity with the AUSA plaintiffs, there is evidence from which a reasonable jury could conclude that the relationship between Gallo and the AUSA plaintiffs approached privity. In order to demonstrate the existence of a near privity relationship, the AUSA plaintiffs must establish that Gallo was aware that his representations would be used for a particular purpose, that Gallo intended that the AUSA plaintiffs would rely on his representations and that there was some conduct on Gallo's part that evinces his understanding of the AUSA plaintiffs' reliance. See Credit Alliance, 493 N.Y.S.2d at 443, 483 N.E.2d at 118.
A reasonable jury could certainly conclude that Gallo issued the no-default certificates for the particular purpose of satisfying JWP's obligation under the note agreements to provide the AUSA plaintiffs with quarterly no-default certificates and that Gallo was clearly aware that the purpose of those certificates was to assure the AUSA plaintiffs that JWP was not in default. Under these circumstances, the jury could conclude further that Gallo intended for the AUSA plaintiffs to rely on those certificates and that he evinced his awareness of their reliance by transmitting the certificates to the AUSA plaintiffs under cover of letters addressed to each AUSA plaintiff. See Ex. 161-64, attached to Brown Steinberg Aff.
Furthermore, a jury could conclude that Gallo made the alleged misrepresentations to Prudential's representatives during due diligence for the 1992 note purchase and in the late summer and fall of 1992 for the particular purpose of assuring them that JWP, and their investments, were basically sound. Furthermore, the jury could decide that Gallo intended for Prudential to rely on those representations. These representations were made in direct conversations with Prudential's representatives, which would certainly satisfy the requirement that Gallo's conduct evince his awareness of the AUSA plaintiffs' reliance.
Accordingly, Gallo's motion for summary judgment dismissing the AUSA plaintiffs' negligent misrepresentation claim against him must be denied, to the extent that this claim is based on the no-default certificates issued by Gallo and on his statements to Prudential's representatives.

6. Tortious Interference with Contract
The AUSA plaintiffs have also asserted a claim against Gallo for tortious interference with contract. Gallo contends that he is entitled to summary judgment *1275 dismissing this claim because there is no evidence that he acted in bad faith, outside the scope of his employment or for his own personal profit. While Gallo is correct that there is no evidence that he profited from the alleged breach of the note agreements, issues of fact exist with respect to whether Gallo acted in good faith and within the scope of his employment. As we explained above, there are questions of fact regarding whether Gallo committed fraud by knowingly or recklessly making allegedly false or misleading statements in the no-default certificates and to Prudential's representatives. Certainly, if Gallo committed fraud, he was acting outside the scope of his employment and in bad faith. Therefore, we deny Gallo's motion for summary judgment dismissing the AUSA plaintiffs' claim against him for tortious interference with contract.

II. Motions for Separate Trial
The four actions that comprise this proceeding have been consolidated for all pretrial purposes. When these actions were transferred to this court's docket, we set a joint trial date for all four actions because our preliminary assessment of the case indicated that a joint trial would be more efficient than separate proceedings. At that time, only Gallo objected to a joint trial. The issue of consolidation was not briefed, and no order was entered consolidating these four actions for trial.
It now appears that a joint trial would be considerably lengthier than the six weeks that this court has available in June and July 1996. Furthermore, we face considerable practical difficulty in holding a joint trial at any time. A joint trial of all four actions would undoubtedly be several months long, and we are concerned, in particular, about the difficulties of empaneling a jury for a trial that lengthy. Nevertheless, the class plaintiffs' claims have been pending since 1992, and we are reluctant to delay further the commencement of the trial of at least a portion of this proceeding.
Therefore, we permitted the parties to file motions seeking separate trials of certain portions of this proceeding. E & Y, the class plaintiffs and Joseph Gallo have made motions pursuant to Fed.R.Civ.P. 42. Although the situation before us does not fit precisely within the ambit of Rule 42(b), which governs the circumstances under which a court may order separate trials of claims presented in the same action, we are guided by the factors identified in that rule in deciding whether to conduct separate trials of any of the actions in this proceeding. Rule 42(b) states that "[t]he court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial...." In deciding which of these four actions to try together, we are guided by the standard set forth in Rule 42(a), which permits the district court to consolidate cases or issues for trial when common questions of law or fact are involved. After considering the memoranda and letters filed by the parties, we conclude that the most workable arrangement is to conduct the trial of In re JWP and Aronoff v. Dwyer beginning on June 24, 1996. The trial of AUSA v. Dwyer and AUSA v. E & Y will be held some time in the fall of 1996.
We recognize that this schedule requires the management defendants and the audit committee defendants to stand trial twice and increases their defense costs, thereby eating into the directors' and officers' liability insurance coverage and the amount collectible on any judgment. For this reason, the class plaintiffs have opposed this schedule. Instead, they have proposed trying In re JWP and AUSA v. Dwyer together beginning in June, with the trial of AUSA v. E & Y occurring in the fall. We are persuaded, however, that the AUSA plaintiffs' claims against E & Y are so intricately intertwined with their claims against the management defendants, the audit committee defendants and Gallo that separating the trials of AUSA v. Dwyer and AUSA v. E & Y would result in extensive duplication of the evidence presented at the respective trials. Moreover, we see little realistic hope of completing a trial of In re JWP and AUSA v. Dwyer in the six weeks available.
The schedule that we have selected will necessitate some repetition of evidence, particularly with respect to the evidence directed *1276 at establishing that the management defendants and the audit committee defendants made false and misleading statements between 1990 and 1992 in JWP's consolidated financial statements, SEC filings and press releases. Substantial differences exist, however, between the class plaintiffs' and the AUSA plaintiffs' claims. The AUSA plaintiffs' claims encompass the additional years 1987 to 1989 and concern statements made in the note agreements and in the no-default certificates issued by Ernest Grendi, Gallo and E & Y, which the class plaintiffs' claims do not. Moreover, the AUSA plaintiffs will present different evidence than the class plaintiffs on the issues of reliance, causation and damages. Therefore, common sense dictates that AUSA v. Dwyer and AUSA v. E & Y, rather than AUSA v. Dwyer and In re JWP, be tried together.
The Aronoff plaintiffs have indicated in a brief letter to the court that if a joint trial of all four actions is not feasible, they would prefer to go to trial with the AUSA plaintiffs than with the class plaintiffs. They have pointed out that their claims cover 1990 through 1992. The AUSA plaintiffs' claims cover 1987 to 1992, and therefore require the AUSA plaintiffs to present evidence spanning the entire period covered by the Aronoff plaintiffs' claims, while the class plaintiffs' claims cover only 1991 and 1992. Despite the Aronoff plaintiffs' assertions to the contrary, however, we conclude that their claims are more similar to the class plaintiffs' claims than to the AUSA plaintiffs' claims. The class plaintiffs' and the Aronoff plaintiffs' assertions are virtually identical with respect to the alleged misrepresentations made in 1991 and 1992. Moreover, the Aronoff plaintiffs have no involvement in the complex history of the AUSA plaintiffs' relationship with JWP, they make no allegations concerning the period from 1987 to 1989, and they do not have claims to try against E & Y. Therefore, it makes more sense to try their claims with the class plaintiffs' claims.
With respect to the trial of AUSA v. Dwyer and AUSA v. E & Y, E & Y has requested that we empanel two juries to hear the AUSA plaintiffs' claims. It contends that Ernest Grendi is likely to take the Fifth Amendment at trial and that the jury will therefore be permitted to draw an inference against him. E & Y argues that once a jury hears the evidence that the AUSA plaintiffs are likely to introduce about the personal relationship between Ernest Grendi and John LaBarca, E & Y's engagement partner for its JWP audits, the jury will draw an impermissible negative inference from Ernest Grendi's invocation of the Fifth Amendment against E & Y. Therefore, E & Y proposes that we empanel two juries at the second trial: one to hear the AUSA plaintiffs' evidence against Ernest Grendi and one to hear the evidence against all of the other defendants. We do not consider it necessary to empanel a separate jury to hear the claims against Ernest Grendi. Appropriate limiting instructions, a proper jury charge and a detailed special verdict form should be sufficient to prevent the jury from drawing any improper inferences against E & Y.[16] Empaneling two juries to hear AUSA v. Dwyer and AUSA v. E & Y would be needlessly inefficient.
Defendant Gallo has sought a separate trial that would address only the claims that the AUSA plaintiffs have brought against him. Gallo argues that because he is named as a defendant only in AUSA v. Dwyer, so little of the evidence in these four actions concerns him that it would be prejudicial to make him stand trial with any of the other defendants. We believe that holding a third trial on these matters is not warranted. First, Gallo's concern has been somewhat alleviated by our decision to separate the AUSA plaintiffs' claims from the class plaintiffs' and the Aronoff plaintiffs' actions. Second, we see no potential for prejudice to Gallo that cannot be countered in his opening and closing arguments and through the use *1277 of a detailed special verdict form. Gallo has indicated that if we do not grant his motion for an entirely separate trial, he is amenable to the schedule that we have selected.

CONCLUSION
1. E & Y's motion for summary judgment, filed in AUSA v. E & Y, 94 Civ. 3116, is denied with respect to the AUSA plaintiffs' claims under § 10(b) and for common law fraud. E & Y's motion for summary judgment on the AUSA plaintiffs' negligent misrepresentation claim is denied in part and granted in part.
2. The audit committee defendants' motion for summary judgment, filed in In re JWP, Lead Case No. 92 Civ. 5815, AUSA v. Dwyer, 93 Civ. 6830, and Aronoff v. Dwyer, 94 Civ. 2201, is denied with respect to the plaintiffs' claims under §§ 10(b) and 20 and the AUSA plaintiffs' claims for common law fraud and tortious interference with contract. Their motion for summary judgment dismissing the AUSA plaintiffs' claims under §§ 12(2) and 15 is granted. Their motion for summary judgment dismissing the Aronoff plaintiffs' negligent misrepresentation claim is granted, while their motion for summary judgment on the AUSA plaintiffs' negligent misrepresentation claim is granted in part and denied in part.
3. Dwyer's and Ernest Grendi's motions for summary judgment, filed in In re JWP, AUSA v. Dwyer and Aronoff v. Dwyer, are denied with respect to the plaintiffs' § 10(b) claims, except that the plaintiffs' claims for aiding and abetting violations of § 10(b) are dismissed. Dwyer's and Ernest Grendi's motions for summary judgment are granted as to the plaintiffs' claims under §§ 12(2) and 15. Their motions for summary judgment dismissing the AUSA plaintiffs' claim for tortious interference with contract are denied.
4. Joseph Grendi's motion for summary judgment, filed in In re JWP, AUSA v. Dwyer and Aronoff v. Dwyer, is granted with respect to the plaintiffs' claims under § 10(b), the Aronoff plaintiffs' and the AUSA plaintiffs' negligent misrepresentation claims and the AUSA plaintiffs' claims under §§ 12(2) and 15 and for tortious interference with contract. His motion for summary judgment is denied with respect to the plaintiffs' claims under § 20 and for common law fraud.
5. Gallo's motion for summary judgment, filed in AUSA v. Dwyer, is granted with respect to the AUSA plaintiffs' claims under §§ 12(2), 15 and 20. It is also granted with respect to the § 10(b) claim of each AUSA plaintiff except Prudential. Gallo's motion is granted in part and denied in part with respect to the AUSA plaintiffs' claims for common law fraud and negligent misrepresentation. His motion is denied with respect to the AUSA plaintiffs' claim for tortious interference with contract.
6. Gallo's and the class plaintiffs' motions for separate trials are denied. E & Y's motion for separate trials is granted in part and denied in part. The trial of In re JWP and Aronoff v. Dwyer will begin on June 24, 1996. The trial of AUSA v. Dwyer and AUSA v. E & Y will be held some time in the fall of 1996.
SO ORDERED.

ORDER ON REQUEST FOR CLARIFICATION
On May 22, 1996, this court issued an opinion and order resolving a number of summary judgment motions in the above-captioned cases. Familiarity with that decision is presumed. Defendant Ernst & Young ("E & Y") has submitted a written request for clarification of the portion of our ruling that granted in part and denied in part E & Y's motion for summary judgment dismissing the negligent misrepresentation claims asserted by the plaintiffs in AUSA Life Insur. Co. v. Ernst & Young, No. 94 Civ. 3116.
The AUSA plaintiffs have alleged that E & Y negligently made misrepresentations in the unqualified audit reports that it rendered on JWP's annual financial statements and in the no-default certificates that E & Y issued pursuant to note agreements between JWP and each AUSA plaintiff. We granted E & Y's motion for summary judgment dismissing the AUSA plaintiffs' negligent misrepresentation claims based on statements contained *1278 in E & Y's audit reports on the ground that there was no evidence of the requisite relationship of privity or near privity between E & Y and the AUSA plaintiffs. We held, however, that under the standard set forth in Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 493 N.Y.S.2d 435, 443, 483 N.E.2d 110, 118 (1985), a jury could find that near privity existed with respect to the alleged misrepresentations contained in each of the no-default certificates. We explained in our opinion that:
The no-default certificates themselves state that they are for the use of the AUSA plaintiffs. It is clear from the face of the certificates that their purpose is to aid the AUSA plaintiffs in determining whether JWP has complied with its obligations under the note agreements. Furthermore, by naming the AUSA plaintiffs in the certificates, E & Y evinced its awareness that the AUSA plaintiffs would rely on the no-default certificates.
Opinion and Order, at 1253-1254 (citations omitted).
The AUSA plaintiffs' remaining negligent misrepresentation claims are based on two theories of liability: that alleged misrepresentations made by E & Y in the no-default certificates induced the AUSA plaintiffs (1) to purchase JWP's notes and (2) to forebear from exercising their rights under the note agreements to take actions that would have mitigated their damages. E & Y concedes that our ruling permits the AUSA plaintiffs to maintain their negligent misrepresentation claims under the second theory. E & Y requests clarification, however, of the consequences of our ruling on the issue of near privity for the AUSA plaintiffs' claims under the first theory.
First, E & Y seeks confirmation that each AUSA plaintiff's negligent misrepresentation claim is dismissed to the extent that it is based on assertions that alleged misrepresentations contained in the no-default certificates induced each AUSA plaintiff's first purchase of JWP's notes. Although we did not say so explicitly in our opinion, that is indeed the effect of our ruling. It is undisputed that no AUSA plaintiff received a no-default certificate prior to its first purchase of JWP's notes. Therefore, alleged misstatements contained in those certificates could not have induced any AUSA plaintiff to make its first purchase.
Second, E & Y contends that any AUSA plaintiff that made more than one purchase of JWP's notes[1] may not maintain a negligent misrepresentation claim based on allegations that misrepresentations contained in no-default certificates issued pursuant to an existing note agreement between that AUSA plaintiff and JWP induced that AUSA plaintiff to make its subsequent purchase(s). Relying exclusively on Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co., 79 N.Y.2d 695, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992), E & Y argues that near privity must be established with respect to each separate note transaction. It further contends that contacts between the parties in conjunction with one transaction are irrelevant in determining whether near privity exists with respect to a subsequent transaction between the same parties. E & Y advanced the same argument in its summary judgment papers, and its reasoning has not become more compelling with repetition.
Security Pacific does not support E & Y's argument. In that case, the New York Court of Appeals held that near privity did not exist with respect to alleged misrepresentations contained in an audit report issued by the defendant accountant because there was no evidence of any conduct on the part of the accountant that evinced its awareness that the plaintiff, an institutional lender, would rely on that audit report in deciding whether to make a loan to the audited company. See id., at 92-93, 597 N.E.2d at 1085-86. In making that determination, the Court disregarded evidence that during the previous year, in conjunction with a different loan application made by the same company, the plaintiff informed the accountant that it was relying on statements that the accountant made in an earlier audit report. The Court *1279 considered that evidence irrelevant because it related to contacts between the parties concerning a different statement, which was not at issue in Security Pacific, rather than because the evidence concerned a different transaction. See id., at 88-89, 597 N.E.2d at 1081-82. In this case, by contrast, there is evidence of conduct by E & Y that evinces its awareness that the AUSA plaintiffs would rely on the statements contained in the no-default certificates, which are the very statements at issue here.
Accordingly, the Security Pacific decision does not foreclose any AUSA plaintiff that made more than one purchase of JWP's notes from asserting a negligent misrepresentation claim based on allegations that misrepresentations contained in no-default certificates issued pursuant to an existing note agreement induced that AUSA plaintiff to make subsequent purchases.
SO ORDERED.
NOTES
[1] Among the alleged accounting irregularities that necessitated these restatements were instances of recording undocumented topside adjustments that artificially inflated income, recording bogus, inflated or uncollectible claims and accounts receivable, abusing percentage-of-completion accounting for recognizing revenue on long-term contracts, abusing purchase accounting to falsely write up assets and understate operating expenses, creating bogus negative good will and amortizing negative good will into income in order to artificially inflate income, failing to reserve for incurred but not reported losses on insurance claims, failing to value inventory properly and failing to reserve for losses caused by deficient inventory controls.
[2] That proceeding was later converted to a voluntary Chapter XI proceeding. On December 14, 1994, JWP emerged from bankruptcy as EMCOR Group, Inc.
[3] The institutional investors that are currently plaintiffs in this action are: AUSA Life Insurance Co., Bankers United Life Assurance Co., Crown Life Insurance Co., General Services Life Insurance Co., Life Investors Insurance Co. of America, Modern Woodmen of America, Monumental Life Insurance Co., The Mutual Life Insurance Co. of New York and The Prudential Insurance Co. of America.
[4] Pursuant to the note purchase agreements between JWP and each AUSA plaintiff, JWP was required to provide each AUSA plaintiff with a certificate from its independent auditor stating that in the course of performing its audit of JWP's consolidated financial statement for the relevant year, the auditor had not obtained knowledge of any "Event of Default or Default." See, e.g., Exhibit 9, at ¶ 5A, attached to Affidavit of Martin L. Perschetz, dated Jan. 5, 1996. The note agreements define that term to include any failure to comply with certain terms and conditions of the note agreements or any failure to make payments under other borrowing agreements as they become due. See, e.g., id., at ¶ 7A.

The AUSA plaintiffs refer to these certificates "no-default certificates," while E & Y prefers "negative assurance letters." For the sake of convenience, we use "no-default certificates."
[5] The three-year prong of this standard is not at issue in this case because the AUSA plaintiffs' § 10(b) claim is based only on the note purchases that took place during 1990 and 1992. Their state law claims, however, encompass the note purchases that they made in 1988 and 1989 as well.
[6] This conclusion does not conflict with Judge Brieant's ruling dated March 30, 1995, see Exhibit 39, at 13-14, attached to Perschetz Aff., in which he denied E & Y's motion to dismiss this claim on statute of limitations grounds. Judge Brieant's decision was based only on the pleadings, which do not specifically set forth the portions of the Form 10-Q that we find crucial. See AUSA/E & Y Complaint, at ¶¶ 88-91.
[7] We do not agree with E & Y's assertion that its audit reports do not satisfy the "in connection with" requirement because it did not know beforehand that JWP would provide its audit reports to the particular institutional investors involved in particular note transactions. Frymire-Brinati does not require so narrow an interpretation.
[8] E & Y's audit procedures included some inquiry into JWP's compliance with its obligations under the note agreements. See Exhibit 308 (audit planning memoranda for 1988-91 audits), attached to Brown Steinberg Aff. This fact does not indicate, however, that the audits were conducted for the particular purpose of assuring JWP's compliance. We find support for this conclusion in the language of the no-default certificates, which specifically stated that E & Y's audits were not directed primarily toward obtaining knowledge of noncompliance. See Exhibit 303, attached to Brown Steinberg Aff.
[9] Kidder Peabody was decided after Central Bank, but the court did not explicitly consider this issue. See Kidder Peabody, 1995 WL 590624, at *9. Likewise, this court recently indicated, in a decision on a motion to dismiss, that under appropriate circumstances, subsidiary-level corporate officials could be primarily liable under § 10(b) for making affirmative misrepresentations that form the basis for allegedly misleading public statements made by others. See In re Leslie Fay Cos., Inc. Securities Litigation, 918 F.Supp. 749, 761-62 (S.D.N.Y.1996). We did not, however, specifically address the possible effect of Central Bank.
[10] The AUSA plaintiffs, in particular, have indulged in the regrettable practice of making conclusory statements that Joseph Grendi personally made false and misleading entries in JWP's and its subsidiaries' books and then referring to a lengthy exhibit, in its entirety, to support those statements. The AUSA plaintiffs may not demonstrate the existence of an issue of fact by, for example, referring to an expert report that is several hundred pages long and informing the court that somewhere within it lies evidence that Joseph Grendi personally made improper accounting entries. On a motion for summary judgment, once a defendant has pointed out the absence of evidence that supports the plaintiff's allegations, the burden is on the plaintiff to present specific evidence that raises issues of fact for trial. We decline the AUSA plaintiffs' invitation to fish for such an issue ourselves.
[11] Even with respect to the acquisition and integration of Businessland, in which Joseph Grendi was directly involved, the evidence cited by plaintiffs would not support a finding that he personally made the alleged misrepresentations. The plaintiffs contend that Joseph Grendi made improper adjustments to the reserves set aside to cover losses incurred as a result of the Businessland acquisition. The testimony that specifically describes how those allegedly improper entries were made, however, indicates that during the relevant period, JWP's corporate accounting department kept the books in which the reserves were recorded, and that "Joe Grendi would provide us with a journal entry [for adjustments], and in certain instances he would verbally communicate the adjustment." See McGinn Dep., at 111, attached as Ex. 74 to Brown Steinberg Aff.
[12] Neither the class plaintiffs nor Joseph Grendi cites controlling authority on this point. Joseph Grendi cites no case law; the class plaintiffs cite one case in which the Fifth Circuit upheld, without commenting on this issue, a district court's holding that a corporate defendant was both a controlled and a controlling person. See Cameron v. Outdoor Resorts of America, 608 F.2d 187, 194 (5th Cir.1979).
[13] The AUSA plaintiffs may not assert claims against Gallo under § 10(b) based on alleged misstatements made after the note purchases occurred. Misrepresentations made after a purchase or sale of securities fail to satisfy the "in connection with" requirement. See Goldman, 1987 WL 12820, at *8.
[14] Prudential also argues that Gallo made a false and misleading statement to JoAnne Heintz, one of its representatives, at a due diligence meeting prior to Prudential's 1992 note purchase. This alleged misrepresentation concerned the integration of the financial and inventory reporting systems of JWP and Businessland, Inc., a very large computer company that JWP acquired in August 1991. See Heintz Dep., at 513-14, attached as Ex. 7 to Affidavit of Joseph I. Fontak, dated Mar. 13, 1996. Gallo has denied making these comments or playing any role in the integration of Businessland. See Affidavit of Joseph A. Gallo, dated Jan. 5, 1996, at ¶ 23; Reply Affidavit of Joseph A. Gallo, dated Mar. 13, 1996, at ¶ 5.

A questions of fact therefore exists regarding whether Gallo made the statement that Heintz has attributed to him. Moreover, under the circumstances of this case, it is for the jury to decide whether that statement was false or misleading.
[15] In March 1992, McQuade transferred to another position at JWP. From March to August 1992, Gallo reported to Ernest Grendi, Dwyer or Sokol. Once Ernest Grendi was replaced by Richard Zannino in August 1992, Gallo reported to Zannino. See Gallo Dep., at 330-31, attached as Ex. 86 to Steinberg Aff.
[16] The cases cited by E & Y in support of its argument do not compel a different conclusion, as they concern the circumstances under which criminal claims against co-defendants have been tried simultaneously before two juries rather than severed. See, e.g., United States v. Lebron-Gonzalez, 816 F.2d 823, 830-31 (1st Cir.), cert. denied, 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 and 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987); United States v. Lewis, 716 F.2d 16, 18-21 (D.C.Cir.), cert. denied, 464 U.S. 996, 104 S.Ct. 492, 78 L.Ed.2d 686 (1983).
[1] These AUSA plaintiffs are: AUSA Life Insurance Company, Crown Life Insurance Company, The Mutual Life Insurance Company of New York and The Prudential Life Insurance Company of America.